IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 9, 2005 Session

IN RE M.O.

Appeal from the Circuit Court for Grundy County
No. 6962     Buddy D. Perry, Judge

No. M2004-01602-COA-R3-PT - Filed February 25, 2005

This appeal involves the termination of a biological father's parental rights with regard to his nine-year-old daughter. After determining that the child had been sexually abused by her father, the Tennessee Department of Children's Services filed a petition in the Circuit Court for Grundy County seeking to terminate the father's parental rights. Following a bench trial, the trial court determined that the father had committed severe child abuse and that his daughter's interests would be best served by terminating his parental rights. The father asserts on this appeal that the Department failed to present clear and convincing evidence that he had committed severe child abuse. We have determined that the record contains clear and convincing evidence that the father committed severe child abuse and that terminating his parental rights is in his daughter's best interests.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

Aubrey L. Harper, McMinnville, Tennessee, for the appellant, L.O.R.

Paul G. Summers, Attorney General and Reporter, and Pamela A. Hayden-Wood, Senior Counsel, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

F.E.T. gave birth to M.O. on December 12, 1994. F.E.T. was not married to her daughter's biological father, L.O.R., and so she took sole custody of the child. However, two years later, F.E.T. surrendered custody of M.O. to the Tennessee Department of Children's Services after allegations of child abuse surfaced. Within six months of the child's removal from F.E.T.'s custody, L.O.R. obtained custody of M.O.

M.O. lived with L.O.R. and two of his brothers in a double-wide trailer.[1] The trailer had three bedrooms, one of which was used for storage. L.O.R. and M.O. shared one bedroom, and L.O.R.'s brothers shared the second bedroom. A babysitter cared for M.O. during the week. L.O.R. would bring M.O. to the babysitter in the morning, and the babysitter would take the child to school, pick her up after school, and care for her until L.O.R. picked her up at the end of the day. L.O.R. kept M.O. on the weekends; however, the babysitter would occasionally care for M.O. on Saturday.

M.O. began to have difficulties at school as she grew older. Her abilities to learn and communicate appeared to be severely impaired. Her teachers were initially uncertain whether M.O.'s problems stemmed from the fact that English was her second language or from some more serious learning disability. Over time, most came to believe that M.O. had a learning disability. After M.O. was forced to repeat kindergarten, extensive testing confirmed that she was functioning at the level of a three-year-old. To add to their concerns, M.O.'s teachers suspected that she had an eating disorder and eventually began to suspect that she had also been sexually abused.

In early August 2002, M.O.'s teachers shared their concerns with the Tennessee Department of Children's Services. After interviewing M.O.'s teacher and babysitter, the Department's investigators conducted separate interviews of L.O.R. and M.O. at its offices on August 22, 2002. L.O.R. brought an interpreter to the interview, and he was accompanied by his two brothers. The Department also arranged for its own interpreter.

During her interview, M.O. revealed that she and L.O.R. shared the same bed. She also stated that she and her father took showers together and that he ejaculated on her head during these showers. She also described how L.O.R. would touch her breasts when they were playing. When the investigators asked M.O. to explain the marks on her legs, she laid on the floor, spread her legs, and stated that L.O.R. would touch her and hurt her with his cowboy boots. During his interview, L.O.R. at first admitted that he shared a bed with M.O. but later insisted that slept on the floor beside her bed. He also agreed that M.O. had an eating disorder and that she had difficulty sleeping at night.

On September 17, 2002, M.O. was interviewed by a forensic interviewer in Chattanooga. During this interview, M.O. provided additional details about L.O.R.'s activities during their showers together. She was also able to identify male and female sexual organs and to explain in some detail what happens when a man and a woman have sex. A physical examination conducted after the interview confirmed that M.O. had a vaginal infection. Based on this information, the Department determined that M.O. should be removed from L.O.R.'s custody.

Two Department employees, a police officer, and an interpreter went to L.O.R.'s trailer to inform him of the decision to remove M.O. from his custody. Upon learning of the Department's decision, L.O.R. became extremely angry. He insisted that the Department was responsible for M.O.'s abuse and that little girls could lose their virginity by falling down. When the Department's employees inspected the trailer, they found no indication, like a pallet or sleeping bag, that L.O.R.

---

[1] For a short period of time, another one of L.O.R.'s brothers also lived in the trailer.

slept on the floor in M.O.'s bedroom. They also observed that none of the rooms looked like a little girl's room and that there were no toys in the trailer.

The Department placed M.O. in a foster home after removing her from L.O.R.'s custody. The foster mother was not informed of the allegations of sexual abuse by L.O.R. However, M.O.'s foster mother soon began to observe the child engaging in unusual, sexually-oriented behavior. She fondled herself, and she refused to take a bath by herself because she explained that her father would bathe with her. M.O. also had several instances of bed wetting, refusing to use the restroom by herself, and being unable to dress herself.

One particularly disturbing event involved a framed photograph of M.O., her father, and one of her father's brothers that M.O.'s foster mother gave to her. Within one day after she gave M.O. the picture, the foster mother discovered that the little girl had taken the picture out of the frame and had scratched out her face and her uncle's pelvic area. When asked why she had defaced the picture, M.O. told her foster mother about an incident when she and her uncle were in his bedroom naked, and he was showing her his "private parts," and they were touching each other. L.O.R. discovered them, and M.O. began to cry because she thought she was in trouble. However, according to M.O., her father walked over to the bed, patted her on the head, told her that it was okay, and then left the room.

M.O.'s behavior appeared to improve as time passed; however, she seemed to have setbacks whenever L.O.R. visited her. On one occasion, L.O.R. questioned M.O.'s foster mother's decision to permit her to use the bathroom by herself. After L.O.R. whispered something to M.O., the child refused to bathe herself, to use the restroom alone, or to sleep without a light on. Eventually, M.O. was required to leave her foster home after she began cutting herself at school.

M.O. was hospitalized in Chattanooga in February 2003.[2] Her treating physicians determined that she had severe developmental and emotional delays. She was also psychotic and depressed at times and often engaged in severe self-mutilation and self-stimulation. Her conduct was consistent with someone who had been sexually traumatized. M.O. frequently talked about sexual abuse by her father and her two uncles. She never named anyone else as an abuser.

While M.O. was hospitalized, the Department arranged for visitations by her father and her babysitter. The Department permitted M.O. to stay with her babysitter for a few days at a time but permitted L.O.R. to have only supervised visitation. The Department soon discontinued L.O.R.'s visits because the hospital staff observed a significant increase in self-stimulating conduct after M.O. spent time with her father.[3]

---

[2]M.O. remained hospitalized until February 2, 2004. She was readmitted one month later in March 2004.

[3]After her first visit with her father, the hospital staff observed M.O. placing her vagina over the water jets in the pool while she was swimming. She refused to stop and started screaming when she was removed from the pool. After another visit, M.O. was found in the hospital bathroom scrubbing her vaginal area with a toothbrush. On another occasion after a visit, M.O. was found rubbing her vagina on a tree in the hospital playground.

On December 28, 2003, the Department filed a petition in the Circuit Court for Grundy County to terminate L.O.R.'s parental rights. During a hearing in March 2004, both the Department's and L.O.R.'s experts agreed that M.O. was the victim of sexual abuse, but they could not identify the perpetrator or perpetrators. All the witnesses agreed that M.O. had never accused anyone other then her father and his two brothers of sexual abuse. L.O.R. denied any involvement in or knowledge of sexual abuse. He admitted that he showered with his daughter, but he explained that he was simply trying to teach her to bathe. He also refused to believe that M.O. had stated that she had been sexually abused and minimized the seriousness of his daughter's developmental delays and psychological condition. He expressed an unwillingness to seek help for M.O. because of his distrust of physicians and the government and insisted that the government was responsible for any abuse that M.O. had suffered.

On September 9, 2004, the trial court filed an order terminating L.O.R.'s parental rights with regard to M.O. The court concluded that L.O.R. had committed severe child abused as defined in Tenn. Code Ann. § 37-1-102(b)(21)(B) (Supp. 2004) and that terminating L.O.R.'s parental rights was in M.O.'s best interests under Tenn. Code Ann. § 36-1-113(i)(6), (7) (Supp. 2004). L.O.R. has appealed. He argues that the Department failed to prove by clear and convincing evidence that M.O. had been sexually abused. He also insists that he and M.O. have a positive relationship and that it is not in her best interests to terminate that relationship. Finally, he argues that the Department failed to make reasonable efforts to reunite him with M.O.

## II.
### THE STANDARDS FOR REVIEWING TERMINATION ORDERS

A biological parent's right[4] to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions.[5] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2059-60 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001). While this right is fundamental and superior to the claims of other persons and the government, it is not absolute. *State v. C.H.K.*, ___ S.W.3d ___, ___, 2004 WL 1813277, at *2 (Tenn. Ct. App. 2004). It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *In re S.M.*, 149 S.W.3d 632, 638 (Tenn. Ct. App. 2004); *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004).

---

[4]This right exists notwithstanding the marital status of the child's biological parents where a biological parent has established or is attempting to establish a relationship with the child. *Lehr v. Robertson*, 463 U.S. 248, 262, 103 S. Ct. 2985, 2993-94 (1983); *In re D.A.H.*, 142 S.W.3d 267, 274 (Tenn. 2004); *Jones v. Garrett*, 92 S.W.3d 835, 840 (Tenn. 2002); *In re Swanson*, 2 S.W.3d 180, 188 n.12 (Tenn. 1999). The right also extends to adoptive parents. *Simmons v. Simmons*, 900 S.W.2d 682, 684 (Tenn. 1995).

[5]U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8.

Termination proceedings in Tennessee are governed by statute. Parties who have standing to seek the termination of a biological parent's parental rights must prove two things. First, they must prove the existence of at least one of the statutory grounds for termination.[6] Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *Jones v. Garrett*, 92 S.W.3d at 838. Second, they must prove that terminating the parent's parental rights is in the child's best interests.[7] Tenn. Code Ann. § 36-1-113(c)(2); *In re A.W.*, 114 S.W.3d 541, 545 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever. Tenn. Code Ann. § 36-1-113(i)(1); *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 565 (1996); *In re Knott*, 138 Tenn. 349, 355, 197 S.W. 1097, 1098 (1917); *In re D.D.K.*, No. M2003-01016-COA-R3-PT, 2003 WL 23093929, at *8 (Tenn. Ct. App. Dec. 30, 2003) (No Tenn. R. App. P. 11 application filed). Because the stakes are so profoundly high, Tenn. Code Ann. § 36-1-113(c)(1) requires persons seeking to terminate a biological parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence. This heightened burden of proof minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d at 622. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003) (No Tenn. R. App. P. 11 application filed), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re S.M.*, 149 S.W.3d at 639; *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d at 733; *In re C.W.W.*, 37 S.W.3d at 474.

Because of the gravity of their consequences, proceedings to terminate parental rights require individualized decision making. *In re Swanson*, 2 S.W.3d at 188. Accordingly, Tenn. Code Ann. § 36-1-113(k) explicitly requires courts terminating parental rights to "enter an order which makes specific findings of fact and conclusions of law" whether they have been requested to do so or not. *In re S.M.*, 149 S.W.3d at 639; *In re M.J.B.*, 140 S.W.3d at 653-54. These specific findings of fact and conclusions of law facilitate appellate review and promote just and speedy resolution of appeals. When a lower court has failed to comply with Tenn. Code Ann. § 36-1-113(k), the appellate courts must remand the case with directions to prepare the required findings of fact and conclusions of law. *In re D.L.B.*, 118 S.W.3d at 367; *In re K.N.R.*, No. M2003-01301-COA-R3-PT, 2003 WL 22999427, at *5 (Tenn. Ct. App. Dec. 23, 2003) (No Tenn. R. App. P. 11 application filed).

---

[6] The statutory grounds for terminating parental rights are found in Tenn. Code Ann. § 36-1-113(g) (Supp. 2004).

[7] The factors to be considered in a "best interests" analysis are found in Tenn. Code Ann. § 36-1-113(i).

The heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c)(1) requires us to adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 548-49; *In re S.M.*, 149 S.W.3d at 640; *In re M.J.B.*, 140 S.W.3d at 654).[8]

### III.
#### THE ADEQUACY OF THE DEPARTMENT'S EVIDENCE

L.O.R.'s principal argument on this appeal is that the Department failed to present clear and convincing evidence that he has engaged in conduct amounting to severe child abuse. The argument appears to rest on two assumptions. The first is that the probative value of the evidence is somehow undermined by the manner in which it was obtained. The second is that the clear and convincing burden of proof cannot be satisfied with circumstantial evidence. L.O.R. is wrong on both counts.

The challenges regarding the manner in which the Department investigated this case are quite vague. L.O.R. does not point to any specific constitutional principle, statute, or common-law rule that the Department violated in the process of gathering information after they received the referral from M.O.'s teachers. He simply complains that the Department should not have relied so heavily on M.O.'s statements during her initial interview in reaching the conclusion that he had sexually abused his daughter. We find nothing in the circumstances depicted in this record that reasonably calls into question the Department's conclusion that M.O. was telling the truth about what her father was doing to her.

L.O.R.'s argument regarding the weight of circumstantial evidence also lacks merit. The law does not distinguish between direct evidence and circumstantial evidence as far as probative value is concerned. Direct and circumstantial evidence is equally relevant, NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.01[5], at 4-10 (4th ed. 2000), and equally probative. *See, e.g.*, *State v. Kirchner*, 600 N.W.2d 330, 334 (Iowa Ct. App. 1999); *State v. Marsh*, 102 P.2d 445, 450 (Kan. 2004); *State v. Jenks*, 574 N.E.2d 492, 502 (Ohio 1991); *State v. Cherry*, 606 S.E.2d 475, 481 (S.C. 2004); *see also* 1A JOHN H. WIGMORE, EVIDENCE § 26 (Tillers rev. 1983). Accordingly,

---

[8]These decisions draw a distinction between specific facts and the combined weight of these facts. Tenn. R. App. P. 13(d) requires us to defer to the trial court's specific findings of fact as long as they are supported by a preponderance of the evidence. However, we are the ones who must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion. The Tennessee Supreme Court used this approach in *In re Valentine* when it recognized the difference between the conclusion that a biological parent had not complied substantially with her obligations in a permanency plan and the facts relied upon by the trial court to support this conclusion. *In re Valentine*, 79 S.W.3d at 548-49; *see also Jones v. Garrett*, 92 S.W.3d at 838-39.

litigants may prove any material fact by direct or circumstantial evidence or a combination of both, *State v. Phillips*, 136 S.W.3d 224, 230 (Tenn. Ct. App. 2003); *Brown v. Daly*, 83 S.W.3d 153, 160 (Tenn. Ct. App. 2001), and in certain situations, circumstantial evidence may be more convincing than direct evidence. *United States v. Robinson*, 177 F.3d 643, 648 (7th Cir. 1999); *Estate of Brock ex rel. Yaden v. Risi*, 63 S.W.3d 729, 731 (Tenn. Ct. App. 2001). Based on these principles, at least one court has explicitly held that circumstantial evidence may be used to satisfy the clear and convincing evidence burden of proof in parental termination cases. *In re Juvenile Appeal (85-2)*, 485 A.2d 1362, 1368 (Conn. Ct. App. 1985).

The Department's evidence regarding the grounds for terminating L.O.R.'s parental rights is largely circumstantial. This is not surprising because abusive acts are rarely performed in public and because sexual predators rarely confess their guilt. The key elements of the Department's case consisted of: (1) the testimony of six of the Department's employees and M.O.'s foster mother recounting M.O.'s statements regarding her father's and her uncle's sexual conduct;[9] (2) L.O.R.'s concession that he showered with his daughter without any credible reason for doing so;[10] (3) L.O.R.'s inconsistent statements regarding his daughter's sleeping arrangements, coupled with the lack of corroborating evidence that he slept on the floor next to his daughter's bed; (4) the photographs of M.O. at age seven in which she is wearing only panties despite her physical maturation;[11] (5) the opinions by both parties' experts that M.O. had been sexually abused; (6) the testimony of M.O.'s foster mother, the Department's employees, and M.O.'s care givers at the hospital in Chattanooga describing M.O.'s acts of self-stimulation following visits with her father; (7) M.O.'s knowledge of human sexual organs and the mechanics of sexual acts that was far beyond the common knowledge of children her age; and (8) L.O.R.'s incredible assertions that young girls lose their virginity simply by falling down and that unknown government agents were actually the ones who sexually abused his daughter.

We have reviewed this record carefully and dispassionately. The conclusion we draw – the only conclusion that reasonable persons could draw – is that the Department presented clear and convincing evidence that L.O.R. has committed severe child abuse, not only by engaging in sex acts with his daughter, but also by failing to protect his daughter from the sexual conduct of his brothers. We reject L.O.R.'s effort to excuse or explain his conduct based on cultural differences. No civilized country would countenance the sort of conduct that L.O.R. engaged in with his daughter. Accordingly, we affirm the trial court's conclusion that the Department presented clear and

---

[9] These statements were consistent over time, and M.O. never implicated anyone other than her father and her uncles.

[10] L.O.R. testified that he showered with his daughter because no adult female was available to teach her to bathe. This explanation did not account for the fact that M.O. spent much of her time with a female babysitter who could have taught her to bathe. It likewise fails to explain why L.O.R. could not have taught his daughter to bathe without actually taking a shower with her.

[11] The photographs were taken by M.O.'s mother who visited L.O.R.'s trailer from time to time.

convincing evidence sufficient to establish that L.O.R. committed severe child abuse in violation of Tenn. Code Ann. § 37-1-102(b)(21)(B).

## IV.
### THE CHILD'S BEST INTERESTS

L.O.R. also asserts that the Department failed to make reasonable efforts to reunite him with M.O. and that terminating his parental rights is not in M.O.'s best interests. He asserts that the Department, notwithstanding its obligation to keep families together, removed M.O. from his custody with no intention to make any reunification efforts and that the parental relationship between him and M.O. should not be severed. We disagree with both assertions.

Children should be removed from their parents' custody only as a last resort and only when the removal is necessary to protect their safety and welfare. Once the Department separates a child from his or her parents, it must, as a general matter, make reasonable efforts to make it possible for the child to return home. *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 48326, at *6 (Tenn. Ct. App. Mar. 9, 2004) (No Tenn. R. App. P. 11 application filed). However, the Department is not required to reunify a child with his or her parents if reunification would endanger the child's health or safety. Tenn. Code Ann. § 37-1-166(g)(1) (2001).

M.O. was removed from L.O.R.'s custody because of her complaints that L.O.R. had sexually abused her. When the Grundy County Juvenile Court found that M.O. was dependent and neglected, the court explicitly determined that the Department had made reasonable efforts not to remove M.O. from L.O.R.'s custody and that returning M.O. to L.O.R.'s home was not "a viable option" in light of her testimony. Accordingly, even though the juvenile court stopped short of finding that L.O.R. had committed severe abuse,[12] the Department's decision not to aggressively pursue reunification of M.O. and L.O.R. was reasonable under the circumstances.

Determining whether terminating a parent's parental rights is in a child's best interests is a factually driven inquiry requiring the consideration of the factors in Tenn. Code Ann. § 36-1-113((i). Tenn. Code Ann. § 36-1-113(i)(6) provides that terminating parental rights is in a child's best interests when the parent has sexually abused the child. In light of its conclusion that L.O.R. had committed severe child abuse on M.O., the trial court was certainly justified in determining that M.O.'s interests would be best served by terminating L.O.R.'s parental rights. There is, in fact, no evidence to the contrary.

---

[12]Tenn. Code Ann. § 37-1-166(g)(4)(A) provides that the Department need not attempt to reunify a child with his or her parents if a court has determined that the parents subjected the child to severe child abuse. In its February 6, 2003 order finding M.O. to be dependent and neglected, the juvenile court stopped short of finding that L.O.R. had committed severe child abuse. Accordingly, the Department cannot take advantage of the exception in Tenn. Code Ann. § 37-1-166(g)(4)(A).

**V.**

We affirm the September 9, 2004 judgment terminating L.O.R.'s parental rights and remand the case to the trial court for further proceedings consistent with this opinion. We tax the costs of this appeal to L.O.R. and his surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.