IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Brief on April 26, 2012

**IN THE MATTER OF ROBERT B.**

**Appeal from the Benton County Juvenile Court**
**No. 3164   John W. Whitworth, Judge**

---

**No. W2012-00006-COA-R3-PT - Filed July 12, 2012**

---

This appeal concerns the termination of a father's parental rights with respect to his son. The father was incarcerated for sexually abusing his stepdaughters, the son's half sisters, while all resided in the same home.  The trial court also found that the father had physically abused the son.  The trial court found that all of this conduct constituted severe abuse pursuant to Tennessee Code Annotated §§ 36-1-113(g)(4) and 37-1-102(b)(23)(C).  It found that termination of the father's parental rights was in the son's best interest.  The trial court entered an order terminating the father's parental rights; the order was entered over thirty days after the termination hearing.  The father appeals the tardiness of the termination order and the best interest finding.  We affirm.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

J. Neil Thompson, Huntingdon, Tennessee for Respondent/Appellant D.B.

Robert E. Cooper, Jr., Attorney General and Marcie E. Greene, Assistant Attorney General Nashville, Tennessee for Petitioner/Appellee State of Tennessee Department of Children's Services.

# OPINION

## FACTS AND PROCEEDINGS BELOW

In this parental termination case, the child at issue, Robert B. ("Robert"), was born to T.C. ("Mother") and Respondent/Appellant D.B. ("Father") in 2002. Mother also has two daughters: D, born in 1994, and B, born in 1992, both from other relationships. Mother and Father were married in 2002. Robert, D, and B all resided with Mother and Father until the children were taken into protective custody by Petitioner/Appellee Tennessee Department of Children's Services ("DCS") in March 2010.[1] The children were removed from the home after DCS received a referral alleging that Father had sexually abused B. The ensuing investigation indicated that Father had sexually abused both girls for many years. The investigation also indicated that Mother was aware of the abuse but nevertheless continued to live in the home with Father.

In March 2010, DCS filed a petition in the Juvenile Court of Benton County, Tennessee, to terminate Father's parental rights as to Robert.[2] The petition alleged that Father had sexually abused stepdaughters D and B on numerous occasions and sought termination on the ground of severe child abuse under Tennessee Code Annotated §§ 36-1-113(g)(3) and 37-1-102(b)(23).[3] The petition also alleged that termination of Father's parental rights was in Robert's best interest because of the severe abuse Father committed in their home.

Father was convicted of rape, rape of a child, and incest as to his sexual abuse of Mother's daughters D and B. By the time of the trial on the petition to terminate his parental rights, Father had received a lengthy sentence on his convictions as to stepdaughter B and was awaiting sentencing on the convictions for the crimes against stepdaughter D.

---

[1] Mother also had an adult daughter who lived in the house with the family at the time the children were removed by DCS.

[2] The petition as filed sought termination of the parental rights of Father, Mother, and the biological fathers of Mother's daughters. DCS later dismissed the petition to terminate Mother's parental rights as well as the biological fathers of Mother's daughters. Thus, at trial, DCS proceeded only against Father regarding the parental rights of Robert. Only Father's parental rights are at issue in this appeal.

[3] DCS's petition for termination cites Section 37-1-102(b)(21). However, this section has since been recodified at Tennessee Code Annotated § 37-1-102(b)(23). For purposes of this appeal, we will refer to the current "severe child abuse" definition found in Section 37-1-102(b)(23).

On August 26, 2011, the trial court held a bench trial on the petition to terminate Father's parental rights.[4] The trial court heard testimony from Mother, Father, stepdaughter D, and the DCS case worker assigned to the family.

At the outset of the trial, stepdaughter D testified. At the time of trial, D was sixteen years old. She testified that Father, her stepfather, began sexually abusing her when she was six or seven years old. She gave a graphic, disturbing description of sexual abuse that occurred almost daily, either at night when Father would come into D's bedroom or during the day while Mother was at work. Typically, the abuse took the form of oral or digital penetration with the child pinned down or against furniture. On at least one occasion in 2007, when D was twelve years old, Mother walked in on Father in the act of molesting D. In response, Mother left briefly with the children, but she and the children returned to the home after a few days. D testified that the abuse continued after Mother returned to the home. D also said that she observed Father inflicting the same type of abuse on B on numerous occasions.

D said that she never saw Father sexually abuse Robert. However, Father beat or "whupped" all of the children regularly with wooden paddles, plastic utensils, and the like. D described a large wooden paddle with the words "attitude adjuster" on it, used in the beatings. Father beat D on her buttocks, back, and legs, on occasion to the point that she was unable to sit. D received beatings for perceived offenses such as not washing the dishes properly or not cleaning her room correctly. D observed Father hit Robert with a kitchen utensil so hard that the utensil bruised Robert, cut him, and left a scar. Father often hit Robert with his hands so hard that the blows would leave welts. D was afraid of Father and worried that if she told anyone about his abuse, her family would lose their house, or she would be beaten even worse.

Mother also testified about Father's abuse against her children. Mother corroborated D's testimony about the 2007 incident in which she walked in on Father abusing D, when D was twelve years old. Mother said that Father whipped Robert too hard and "smacked [Robert] in the face and in the head." Mother explained that Father whipped Robert because Robert was hyperactive and because Father did not know how to control his own temper. Mother said that Father often "didn't want to be bothered" with taking care of Robert. Asked about terminating Father's parental rights as to Robert, Mother said that she "thought it would be a bad thing for [Robert] and his dad to have a relationship" and that it would be good "to end it."

---

[4]The DCS petition also included dependency and neglect allegations. At the outset of the trial, Mother stipulated as to dependency and neglect.

Father testified as well. Father flatly denied all of the physical and sexual abuse allegations against him. He claimed repeatedly that he was "wrongly convicted" of raping stepdaughters D and B. Father confirmed that he had already served over a year in jail for these offenses; he had already been sentenced to ten years incarceration on the convictions as to one stepdaughter and was awaiting sentencing on the convictions as to the other. When asked about disciplining the children, Father would admit only to having "whupped them when they needed it." When Father was given the opportunity to explain why it would not be in Robert's best interest to terminate Father's parental rights, Father proclaimed: "I'm his father. I mean, I've never hurt him in the past. I'll never hurt him in the future. I mean, I love my son. He's my whole world, my life."

Finally, the trial court heard testimony from the DCS case worker, Karen Team ("Team"). At the time of the trial, Team had worked with the family for almost two years. During that time, Father was incarcerated and had had no physical contact with Robert. Father began writing Robert monthly letters in the fall of 2009. Robert received the letters, but to Team's knowledge, Robert had not chosen to write any letters back to Father.

Team confirmed that Robert had been in the home with his half sisters when the sexual abuse occurred. She said that Robert was clearly affected by all of the abuse in the household. Team described an incident that occurred after the children were taken into protective custody and placed in foster care, in which Robert inappropriately touched a female foster child near a pool, mimicking the type of sexual abuse Father had inflicted on his sisters. Robert was moved to another foster home because he was acting out sexually. Team stated that Robert's behavior in foster care was influenced by his upbringing but added that Robert's behavior had improved tremendously in his new foster home. Team testified that it was in Robert's best interest for the trial court to terminate Father's parental rights.

At the conclusion of the trial, the trial court issued an oral ruling. After reviewing the testimony, the trial court pronounced Father's testimony "not credible." The trial judge described D's testimony as "overwhelming and very compelling." The trial court said that the testimony showed "a pattern that [Father] abused these children, not only sexually, but physically as well." It held that Father's actions constituted "severe abuse" as grounds for termination. It also held that the termination of Father's parental rights was in Robert's best interest and found clear and convincing evidence to support its determination on both grounds and best interests. In its oral ruling, the trial court explained the holding on Robert's best interest:

> Now, as far as in the best interest, I do find that the rights of the father should be terminated. I do find that it's in the best interest of the child. He's had no real contact other than the letters that have been introduced for a year and a

half while [Father has] been in jail. We do have a long prison sentence facing him. It's going to be, I think the testimony was another probably seven years anyway that he's not going to be able to have any, little direct contact of any meaningful amount. I find that there was physical abuse and that certainly the most compelling thing in this case is the sexual abuse that occurred to two other children living in the same home.

And so for all those reasons, and the fact that we see now that he was acting out those – the – what he saw in the home, it's in the best interest that the parental rights be terminated at this time and that he be able to go forward and have a – have a [sic] hopefully a better future.

The trial court entered a written order on November 28, 2011. The written order repeated many of the trial court's oral rulings and referenced trial exhibits such as the certified copies of Father's convictions for rape and incest.[5] The trial court found by clear and convincing evidence that Father committed these crimes against stepdaughters D and B while they all resided in the home with Robert. It explicitly found: "Robert is currently nine years old and was impacted by the sexual abuse of his siblings as evidenced by him sexually reacting out in the foster home and having to be moved to a different home." As grounds for termination of Father's parental rights, the trial court found that Father committed severe child abuse within the meaning of Tennessee Code Annotated §§ 36-1-113(g)(4) and 37-1-102(b)(23)(C), and referenced specific instances in its order. The trial court further found that Father had been sentenced to ten years of incarceration for rape and incest and was awaiting sentences on his other convictions for rape of a child and the second incest charge.

With respect to Robert's best interest, the trial court's order concluded, based on clear and convincing evidence, that termination of Father's parental rights was in Robert's best interest. The order explained:

Here, the Court concludes that termination as to [Father] is in the child's best interest. By clear and convincing evidence termination is in the best interest of [Robert] as to [Father] as he has had no real contact with his father in one and a half years, [Father] has a long prison sentence, there was physical abuse and severe sexual abuse in the home against two of Robert's half siblings.

On this basis, the trial court terminated Father's parental rights as to son Robert. Father now appeals.

---

[5]Father stipulated at trial that he was convicted on August 16, 2011 of rape of a child and incest as to D and that he was awaiting sentencing on those charges.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Father does not contest the trial court's finding of grounds for the termination of his parental rights but focuses instead on the timeliness of the trial court's order and its best interest determination. Father argues first that the trial court's written termination order should be set aside because it was not entered within thirty days after the trial. Second, Father argues that the trial court failed to make specific findings of fact to support its conclusion that the termination of his parental rights was in the best interest of the child. Finally, Father contends that the trial court erred in finding that the termination of his parental rights was in the best interest of the child.

Termination proceedings are governed by statute in Tennessee. A party with standing to seek the termination of the parental rights of a biological parent must first prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1) (2010). Secondly, the party seeking termination must prove that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2). Because of the profound consequences of a decision to terminate parental rights, courts must apply a higher standard of proof. Therefore, the elements required for termination of parental rights must be proven by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re Askia K.B.*, No. W2010-02496-COA-R3-PT, 2011 WL 4634241, at *7; 2011 Tenn. App. LEXIS 549, at *20 (Tenn. Ct. App. Oct. 7, 2011).

Using the standard under Rule 13(d) of the Tennessee Rules of Appellate Procedure, we first review the trial court's specific findings of fact to determine whether they are supported by the preponderance of the evidence; we presume these facts to be correct unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). We then determine whether the combined weight of the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish all of the elements required to terminate the biological parent's parental rights. *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007); *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004). The trial court's conclusions of law, including its conclusion that DCS presented clear and convincing evidence to support termination, are reviewed *de novo* on the record, affording them no presumption of correctness. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993); *In re Askia K.B.*, 2011 WL 4634241, at *7; *In re Tiffany B.*, 228 S.W.3d at 156.

## ANALYSIS

### Timeliness of Order

Father argues that the order terminating his parental rights was not entered in a timely manner as required under Tennessee Code Annotated § 36-1-113(k) and thus should be set aside. As mentioned, Section 36-1-113(k) states: "The court shall enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." Tenn. Code Ann. § 36-1-113(k)(2010). Here, the trial was conducted on August 26, 2011, and the written order was entered on November 28, 2011.

Certainly Section 36-1-113(k) evidences the legislature's intent that parental termination cases be handled expeditiously. It does not indicate, however, that a termination order entered over thirty days after the trial must be set aside. *See In re M.R.W.*, No. M2005-02329-COA-R3-PT, 2006 WL 1184010, at * 3; 2006 Tenn. App. LEXIS 297, at *9-10 (Tenn. Ct. App. May 3, 2006). The thirty-day time frame referenced in Section 36-1-113(k) is merely directory and not mandatory. *Id.*; *see also In re Zada M.,* No. E2010-02207-COA-R3-PT, 2011 WL 1361575, at *5; 2011 Tenn. App. LEXIS 176, at *14 (Tenn. Ct. App. Apr. 11, 2011); *In re B.N.J.,* No. M2008-02442-COA-R3-PT, 2009 WL 4017161, at *4; 2009 Tenn. App. LEXIS 774, at *15-16 (Tenn. Ct. App. Nov. 19, 2009). The trial court's failure to comply with the statutory time frame does not require the appellate court to vacate or reverse the termination order. *In re Zada M.,* 2011 WL 1361575, at *5; 2011 Tenn. App. LEXIS 176, at *14; *In re Thomas P*., No. E2005-01367-COA-R3-PT; 2006 WL 1491610, at *7; 2006 Tenn. App. LEXIS 357, at *22 (Tenn. Ct. App. May 31, 2006) (quoting *In re M.R.W.,* 2006 WL 1184010, at *3) ("[W]hile the legislature intended that termination cases 'be adjudicated as expeditiously as possible,' a court's failure to enter an order in a termination case within 30 days is not fatally defective to the validity of the order.")). This argument is without merit.

### Specificity of Findings

Father argues next that the trial court "made no specific finding of fact relative to the best interest of the child and failed to apply any facts to the law to support a legal conclusion that termination of [Father's] parental rights was in the best interest of [Robert]." He asserts that the trial court failed to refer in its written order to any facts to support the conclusion that there was no meaningful relationship between Father and Robert and argues as well that the trial court did not apply the alleged abuse against the half siblings to the best interest factors listed in Section 36-1-113(i). He also contends that the trial court failed to refer in its written order to any of the statutory factors that weighed in Father's favor, though he fails to specify exactly what factors those may be.

After examining the trial court's six-page written order in this case, we find that the order sets forth specific findings of fact to support the trial court's conclusion that termination of Father's parental rights was in Robert's best interest. We consider the trial court's order as a whole; there is "nothing which requires that the trial court's findings of fact or conclusions of law be in a specific part of the order." *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *7 n.6 (Tenn. Ct. App. May 15, 2009). The written order in this case details specific incidents of both physical and sexual abuse that took place in the home and describes the impact that the abuse had on Robert. Moreover, the trial court clearly sets forth its factual findings on Father's convictions and the duration of Father's incarceration.

The trial court commented in the course of its best interest analysis that Robert "has had no real contact with his father in one and half years," but focused primarily on Father's lengthy incarceration and on the sexual and physical abuse that occurred in the home. We simply do not understand Father's assertion that the trial court made "no attempt to apply the alleged abuse against the half-siblings to the [best interest] factors," and this argument is not explained.[6] Also, Father seems to argue that the trial court was required to make findings on statutory best interest factors that favor Father. Father does not identify what factors would favor Father, but assuming they exist, he cites no authority for his assertion. Overall, we find that the trial court made sufficiently specific findings to support its conclusion on Robert's best interest.

### Best Interest

Finally, Father argues that the trial court erred overall in finding that the termination of his parental rights was in Robert's best interest. Father suggests that only one of nine statutory best interest factors set forth in Tennessee Code Annotated § 36-1-113(i) is satisfied.[7]

---

[6]We note that the definition of "severe abuse" can include abuse of any child, not just the child at issue in the termination proceedings. Tenn. Code Ann. § 37-1-102(b)(23).

[7]Section 36-1-113(i) sets forth the following factors for a trial court to consider in determining whether termination of a parent's parental rights is in the best interest of the child:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable

(continued...)

Father concedes that the sixth statutory factor was proven, namely, that the parent "has shown brutality, physical, sexual, emotional, or psychological abuse . . . toward the child." Tenn. Code Ann. § 36-1-113(i)(6). Father argues, however, that this "is the only factor against [Father] as the Court did find that he severely abused the child's half-siblings based on the evidence and [Father's] criminal convictions." Father seems to argue that no other factors weigh in favor of termination and that this factor alone is insufficient. Listing each statutory factor, Father argues strenuously why each is either not applicable to this case or weighs against termination.

First, we disagree with Father's basic premise. Certainly the trial court stressed Father's severe abuse in its best interest determination, but it considered other factors as well. In its written order, the trial court found that termination was in Robert's best interest because he "has had no real contact with his father in one and a half years, [Father] has a long prison

---

[7](...continued)
> efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(2011).

-9-

sentence, there was physical abuse and severe sexual abuse in the home against two of Robert's half-siblings." Next, the list of best interest factors in Tennessee Code Annotated § 36-1-113(i) is not exhaustive, and courts are not required to make a finding as to each factor in order to conclude that the termination of a parent's parental rights is in the best interest of a child. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).

Third, assuming *arguendo* that the sixth-listed best interest factor is the only factor favoring termination, this is no reason for reversal. This Court has routinely held that under the circumstances presented in a particular case, a single best interest factor can be sufficient to support a finding that the child's interests are best served by the termination of parental rights:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors . . . , as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests.
>
> * * *
>
> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005) (citations omitted). Father's argument suggests precisely the type of "rote examination" we have previously rejected. *See In re M.O.*, 173 S.W.3d 13, 21-22 (Tenn. Ct. App. 2005) (finding that "in light of its conclusion that [a father] had committed severe child abuse [against his child], the trial court was certainly justified in determining that [the child's] interests would be best served by terminating [the father's] parental rights.").

We reject the advocacy of such "rote examination" again. In this case, virtually every type of abuse listed in Section 36-1-113(i)(6) is present, namely, "brutality, physical, sexual, emotional [and] psychological abuse . . . toward the child [and] another child . . . in the family. . . ." This factor alone provides ample basis for terminating Father's parental rights. Despite Father's disavowal, the record shows that nearly every day, Father defiled, tormented, and tyrannized the unfortunate children in his home. Father's failure to take responsibility for his actions only magnifies the harm he inflicted on these children.

"Few consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787; 102 S. Ct. 1388, 1412 (1982). It is not a decision to be taken lightly. However, on this record, clear and convincing evidence compels affirmance. Termination of Father's parental rights is in the best interest of this child.

## CONCLUSION

The decision of the trial court is affirmed. Costs on appeal are assessed against Appellant D.B., for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE
