IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
ASSIGNED ON BRIEFS MARCH 17, 2005

## IN THE MATTER OF B.L.R., D.O.B. 10/14/02, A CHILD UNDER EIGHTEEN YEARS OF AGE

### Direct Appeal from the Juvenile Court for Weakley County
No. C-1422    James H. Bradberry, Judge

---

### No. W2004-02636-COA-R3-PT - Filed August 4, 2005

---

This appeal involves the termination of the parental rights of a biological father to his infant daughter. The day after the daughter was born, the Department of Children's Services became involved with the family and learned that both the mother and father were using methamphetamine. Shortly after the department became involved in this case, the mother took very little interest in her infant daughter. The department implemented several permanency plans calling for father to demonstrate that he remained drug free and was attending counseling to resolve his addiction. When the father failed to attend counseling on a regular basis and continually tested positive for methamphetamine, the department filed a petition to terminate his parental rights. Following a hearing on the petition, the trial court held that the department had proven, by clear and convincing evidence, all the grounds for termination alleged in the petition. The trial court also held that terminating father's parental rights was in the child's best interest. Father appealed, and we affirm the trial court's decision regarding the grounds for termination, however, we vacate the order and remand this case to the trial court for further action consistent with this opinion.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part; Vacated in Part and Remanded

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Langdon S. Unger, Jr., Martin, TN, for Appellant

Paul G. Summers, Attorney General and Reporter, Kate Eyler, Deputy Attorney General, Nashville, TN, for Appellee

# OPINION

## I.
### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On October 14, 2002, Brandy Lynn Adams ("Mother") gave birth to a daughter, B.L.R. While Mother was not married at the time she gave birth to B.L.R., Larry Gene Roney ("Father" or "Appellant") subsequently acknowledged that he is the biological father of B.L.R. Mother and Father never married.

On October 15, 2002, the Department of Children's Services ("DCS") received a referral, apparently from hospital staff, concerning B.L.R. Camille Liggons ("Ms. Liggons"), an investigator with Child Protective Services, was assigned the referral. Ms. Liggons learned that, despite having a normal delivery, Mother had not engaged in prenatal care, and Mother and Father were using, manufacturing, and/or selling methamphetamine.[1] Thereafter, DCS placed Intensive Family Preservation into the home on October 21, 2002, to work with Mother. At the time of B.L.R.'s birth, Mother lived with her mother and father. During Ms. Liggons' initial interview with Mother, Mother stated that she and Father were having relationship problems, and she agreed that she would continue to reside with her parents.[2] Shortly after B.L.R. was born, Mother's parents forced her to leave their home. Mother then moved in with Father, and DCS paid the rent and some utilities to assist Mother and Father with setting up a new home. However, Mother and Father were ultimately evicted when they stopped paying rent. Mother subsequently took B.L.R. and returned to her parents' home.

On December 12, 2002, Ms. Liggons attempted to contact Mother and Father to follow up on their progress, but she could not locate them. On December 18, 2002, Ms. Liggons finally located Mother and B.L.R. at a house occupied by one of Father's relatives. Ms. Liggons stated that she found B.L.R. to be "extremely dirty" and Mother to be "strung out." DCS apparently administered a drug screen, and Mother tested positive for methamphetamine use. DCS could not locate Father, and Ms. Liggons learned that both Mother and Father had outstanding warrants for their arrest. On December 18, 2002, DCS took B.L.R. into protective custody. On December 20, 2002, DCS filed a "Petition for Temporary Custody" in the Juvenile Court of Weakley County, Tennessee, claiming that B.L.R. was a dependent and neglected child. That same day, the juvenile court entered a "Protective Custody Order" temporarily placing B.L.R. into the custody of DCS.

After DCS took custody of B.L.R., Mother disappeared and could not be located for some

---

[1]In approximately 1998, Mother gave birth to a son who tested positive for methamphetamine at birth. DCS took custody of the child, and Mother's parental rights to her son were eventually terminated. Around the year 2000, a family adopted B.L.R.'s older brother.

[2]Around the time of B.L.R.'s birth, Father had just been released from jail on bail pending resolution of charges for domestic violence assault against Mother.

time. On January 14, 2003, DCS created a permanency plan with the sole goal of returning B.L.R. to her parents. Under this plan, Father was responsible for satisfying the following requirements before he could regain custody of B.L.R.: (1) complete an alcohol and drug assessment, follow treatment recommendations, and submit to random drug screens; (2) maintain a safe and stable home for at least four months; (3) complete a mental health evaluation, follow treatment recommendations, and continue with any counseling until released by the counselor; and (4) resolve all pending legal issues. Subsequent plans entered on July 21[3] and September 23, 2003,[4] reiterated the above requirements, but they also required Father to avoid associating with known drug users and/or dealers, maintain employment, and obtain his driver's license.[5] After creating the initial permanency plan, DCS referred Father for an alcohol and drug assessment and also made a referral for a mental health evaluation. DCS subsequently placed Intensive Family Preservation services in the home to help Father work toward reunification. All of the services required by the permanency plans were paid for by either DCS or TennCare.

Father underwent an initial mental health evaluation in January of 2003. DCS apparently permitted Father, based upon the recommendation of the mental health counselor, to have unsupervised visitation with B.L.R. for eight hours one day per week. DCS subsequently learned that Father had allegedly molested a child a number of years prior, therefore, DCS referred Father for a psychological and psycho-sexual evaluation. DCS also filed a petition in the juvenile court on June 20, 2003, seeking a no contact order. That same day, the juvenile court entered a "Restraining Order and No Contact Order" forbidding contact between Father and B.L.R. pending a future hearing. On July 18, 2003, the trial court entered an order requiring that future visitation between B.L.R. and Father be supervised. Father never completed a psycho-sexual evaluation.

On November 3, 2003, DCS filed a petition in the juvenile court seeking to terminate Father's parental rights regarding B.L.R.[6] The petition alleged that B.L.R. had been in DCS custody since December 18, 2002. The petition also alleged that Father had been given nine drug screens, five of which revealed he tested positive for methamphetamine use. DCS also stated that Father had not complied with the drug and mental health counseling required by the permanency plans. Accordingly, DCS alleged the following as grounds for terminating Father's parental rights: (1)

---

[3]This permanency plan listed the dual goals of returning B.L.R. to her parents or placement with a relative.

[4]This permanency plan listed the dual goals of returning B.L.R. to her parents or adoption.

[5]Father had previously been convicted of driving under the influence, and he was also arrested for driving on a revoked license during the pendency of the case.

[6]In its petition, DCS also sought to terminate Mother's parental rights. That same day, the DCS case manager assigned to the case filed an affidavit with the juvenile court stating that Mother's whereabouts were unknown. DCS's last contact with Mother occurred in August of 2003 when Mother refused a drug screen stating that she used methamphetamine the prior weekend. The trial court ordered that notice of the petition be published in a local newspaper for four consecutive weeks. On March 3, 2004, the juvenile court entered an order terminating Mother's parental rights to B.L.R. by default. Mother has not filed an appeal in this case, therefore, we are only concerned with Father's parental rights to B.L.R. on appeal.

abandonment by his willful failure to visit, (2) abandonment by his willful failure to support, (3) the condition which led to removal, or other conditions, still persist in the home, and (4) substantial noncompliance with the permanency plans implemented by DCS. On August 19, 2004, the juvenile court conducted a hearing on DCS's petition. At trial, DCS presented the testimony of numerous witnesses and introduced several exhibits to primarily explain Father's lack of effort toward satisfying the requirements in the permanency plans between the implementation of the first permanency plan and the date of trial.

Terry Winbush ("Mr. Winbush"), a licensed addictions therapist with Pathways Behavioral Health Services ("Pathways"), testified concerning Father's level of participation in drug counseling. He conducted the initial alcohol and drug assessment of Father on February 21, 2003. In conducting the evaluation, Mr. Winbush found that Father had a "high probability of having a substance dependence disorder and is in need of care." Father subsequently entered substance abuse counseling with Pathways on an outpatient basis on March 27, 2003. On August 21, 2003, Mr. Winbush created a report explaining that Father had attended three sessions and missed four up to that date. In this report, Mr. Winbush stated that "[Father's] progress is mostly superficial and has a poor prognosis." He also discussed a letter, dated December 9, 2003, that he and a colleague drafted at the request of Father's attorney stating that, as of that date, Father attended eleven and missed seven of his appointments with the counselors. Mr. Winbush also stated in the letter that he believed Father to be drug free at that point. Mr. Winbush admitted, however, that, at the time he drafted the letter, he had never seen the results of any of Father's drug screens. The last time Mr. Winbush saw Father was on March 15, 2004, and he had not released Father from counseling at that point. Mr. Winbush testified that Father simply stopped coming to their sessions. He admitted that Father called him after he stopped attending the counseling sessions, but he did not have time to return his calls. Mr. Winbush also expressed his opinion that, if Father were allowed to embark on a new program of counseling, Father could overcome his addiction.

Several witnesses called by DCS to testify at the hearing presented testimony and exhibits demonstrating that Father continued to use methamphetamine both prior to and after DCS filed the petition to terminate Father's parental rights to B.L.R. Laura Tony ("Ms. Tony"), an employee of Pathways, testified that she conducted random drug screens of Father. Ms. Tony stated that, early on during the process, Father would come to her office and request a drug screen, but she refused his offers because the test would not be random. She first tested Father on February 12, 2003, and performed a total of eight drug screens on Father by taking urine samples. Her records indicated that Father tested positive for methamphetamine on February 12, 2003, February 20, 2003, and March 6, 2003. Father tested negative for methamphetamine on March 26, 2003, October 14, 2003, December 9, 2003, January 13, 2004, and May 25, 2004. Emily Gatlin ("Ms. Gatlin"), the records custodian for Rapid Care, a facility which collects and screens different samples to identify drug use, identified two documents showing the results for two drug screens performed on hair samples submitted by Father. The first test, performed on July 8, 2003, indicated that Father tested positive for methamphetamine. The second test, performed on December 9, 2003, indicated that Father tested positive for methamphetamine and amphetamine.

Dr. James Meeker ("Dr. Meeker"), a licensed toxicologist with West Tennessee Health Care, testified concerning the various samples used to test for drugs in the human body. Dr. Meeker reviewed several drug screens performed on Father's hair, blood, and urine between February of 2003 and March of 2004. He stated that methamphetamine can be detected in blood for up to forty-eight (48) hours, urine for three to four days, and hair, if taken from the base of the scalp, for up to ninety (90) days.[7] After analyzing the test results of the various samples taken from Father, Dr. Meeker created a chart encompassing all of the months of 2003. Dr. Meeker used this chart to explain to the trial court how, using the results from various samples, he charted Father's drug use during 2003. Dr. Meeker did admit, however, that his analysis could not identify a particular drug user's specific pattern or frequency of use.

Dr. Meeker evaluated two urine samples submitted by Father which were tested in February of 2003, both revealing positive results for methamphetamine. With the ability to detect methamphetamine in urine for three to four days, he surmised that father used methamphetamine in the month of February 2003. Next, he evaluated a blood sample which was taken from Father and tested in May of 2003, and it also indicated positive for methamphetamine use. This result from a blood sample, he opined, would mean that Father used methamphetamine in May of 2003 within forty-eight (48) hours of that test. He also evaluated the test results from a hair sample taken from Father in July of 2003 which tested positive for methamphetamine. He testified that this indicated that Father had used methamphetamine on multiple occasions between April of 2003 and July of 2003. Then, he evaluated a urine sample taken from Father in August of 2003 which tested positive for methamphetamine, indicating Father used the drug within that month. Finally, Dr. Meeker evaluated the test results from another hair sample taken from Father in December 2003 which also tested positive for methamphetamine. This indicated to him that Father had used methamphetamine, again on multiple occasions, between September 2003 and December 2003.

DCS also presented testimony related to Father's mental health. John Burroughs ("Mr. Burroughs") and Carolyn Burroughs ("Mrs. Burroughs") have been B.L.R.'s foster parents since she came into DCS custody in December 2002. Mrs. Burroughs is also Father's cousin. Mrs. Burroughs has interacted with B.L.R. since she was born, and she and Mr. Burroughs expressed their desire to adopt B.L.R. At trial, Mr. Burroughs testified concerning a previous suicide attempt by Father which he witnessed. Mr. Burroughs stated that Father had a .22 caliber rifle and asked Mr. Burroughs to shoot him, but he refused Father's request. Later that same night, Father, in the presence of Mr. Burroughs, took the rifle and shot himself in the shoulder. He stated that Father told him "he wanted to know what it felt like to shoot hisself in case he did commit suicide." Mrs. Burroughs testified that Father has a bad temper, but she admitted that she has not been inside Father's house within the year prior to the trial.

On April 4, 2004, Dr. Charles Viar ("Dr. Viar"), a licensed senior psychological examiner with Pathways, evaluated Father and prepared a report setting forth his findings. During the initial evaluation, Dr. Viar reported that Father "approached evaluation with anger, sarcasm, made crude

---

[7]Dr. Meeker testified that every half-inch of hair typically represents a thirty-day period of detection.

attempts throughout the evaluation to manipulate the procedure in his favor and continually blamed [DCS] for his problems." He described Father's disposition during their initial meeting as "quite hostile." Dr. Viar recommended that Father undergo individual psychotherapy and drug treatment. He diagnosed Father as having major depression, amphetamine dependence, alcohol dependency, and antisocial personality disorder. Dr. Viar recommended that Father initially go through such therapy over a six month period. Dr. Viar testified that, if Father had not been attending therapy sessions, he would question returning custody of B.L.R. to Father. He also admitted that, at the time he made his diagnosis, he only had access to four drug screens conducted on Father, all of which were positive for methamphetamine use. When asked if knowledge that some of Father's drug screens were negative would change his diagnosis, Dr. Viar stated that he would have reached the same diagnosis, but the chances of Father successfully completing therapy would have improved. Other than their initial meeting, Dr. Viar had no further contact with Father.

Kelly Green ("Ms. Green") served as the case manager for B.L.R.'s case on behalf of DCS. She testified that Father consistently refused to provide DCS with proof of his income, despite adding the requirement that he obtain employment to the permanency plan. Ms. Green testified that Father's employment has been sporadic, and she would call Father's employer after he worked at a particular job for a while only to learn that he had either been fired or quit. Ms. Green stated that Father has never paid child support for B.L.R., and he is currently in arrears in the amount of $5,000.00. However, Father was able to pay his fines in the thousands of dollars, and he even paid between $1,500.00 and $2,000.00 to secure a new driver's license. Ms. Green stated that, at the time he obtained his new license, Father did not have a job. Regarding his present home, Ms. Green admitted that Father keeps it clean and appropriate. She also stated that the psychological evaluation performed on Father revealed two prior suicide attempts, in addition to the one witnessed by Mr. Burroughs.

Ms. Green stated that, in her opinion, Father's drug use was the biggest obstacle to reuniting him with B.L.R. She conveyed how Father would become "very aggressive" and curse her when he was asked to submit to a drug screen. After a hearing in August of 2003, Ms. Green randomly tested Father and found him to be positive for methamphetamine. They then took Father to a hospital to submit to a urine test which also indicated Father had used methamphetamine. When she confronted him with the results, Ms. Green stated that Father became angry and told her that he submitted a six-year old's urine at the hospital as his own sample, therefore, the test was wrong. Ms. Green relayed that, during one of B.L.R.'s supervised visits with Father, he stated that some individuals had come by his house to buy drugs. He told Ms. Green that he sent them away, however, she became concerned about how they knew to come to Father to buy drugs. Ms. Green also expressed her concerns that some of Father's family members also use illegal drugs. She stated that DCS stopped giving Father drug screens in 2004 after DCS refused to provide more funding for testing. In March of 2004, Ms. Green gave Father the last test performed by DCS which came back positive for methamphetamine use.

In response to the proof presented by DCS, Father called several of his own witnesses to demonstrate the improvement he made in his life since DCS filed the petition to terminate his

parental rights to B.L.R. Bobby Doyer ("Ms. Doyer"), an employee of Outback Victims Assistance Program and Father's neighbor, testified that, at the time of trial, she believed Father was no longer taking drugs. She stated that Father keeps an "immaculately clean home." Ms. Doyer stated that Father came to her for help, but she admitted that she is not a licensed counselor. She also admitted that she did not keep records of her interactions with Father because their relationship was not conducted pursuant to her employment. Starla Roney, Father's sister, reiterated that Father made improvements in his life in the months before trial, but she stated that, while she had never seen Father use methamphetamine, she did know that he had tested positive for the drug in the past. Eury Smith, Father's pastor, testified that, while he did not know the specifics of Father's prior drug use, he believed Father was sincere about reuniting with his daughter.

Father also testified at trial. When asked about the money he used to pay his fines, he stated that he paid the fines by doing "side jobs." He also stated that he could not remember when he last filed an income tax return. When asked about his drug use, Father admitted that he had previously engaged in manufacturing methamphetamine about eight years prior. He also stated that he last used methamphetamine about six months prior to the hearing. When he did use methamphetamine, Father stated that he would use it approximately once a week. When asked about the present state of his methamphetamine use, Father testified as follows:

> Q. Do you feel like you have a methamphetamine problem?
> A. Yes, I've had a problem with it.
> Q. But you say you don't have a problem now?
> A. I'm not going to say that. I mean, its not no — just get over it, overnight thing.

Father also stated that he has family members who have problems with methamphetamine as well. Father testified that he substituted a six year old child's urine for his own during one of his drug screens which produced a positive result.

Father also testified that, as of the date of the hearing, he had resolved all of his criminal matters that were previously pending. While he secured a valid license by the time of the hearing, Father admitted that he drove without a valid license for several months. Father acknowledged his obligation under the permanency plans to seek counseling, but he stated that he did not attend because he had to work. He also acknowledged that he is partially to blame for missing his counseling sessions. Father acknowledged that he has not paid child support, but he has paid his fines and other bills.

Father's position at the hearing was that, in the months leading up to the trial, he has improved his station in life. According to Father, he has started attending church, and he argues that, as the most recent drug screens indicate, he remained drug free for several months prior to the hearing. Father asserted that, if the trial court were to give him six more months to go through counseling as Dr. Viar suggested, he would change. In fact, Father stated that if he did not remain drug free for an additional six-month period, he would voluntarily sign over his rights to B.L.R.

At the conclusion of the hearing, the trial court addressed the parties on the record. The juvenile court, after discussing certain aspects of the proof, determined that DCS proved the grounds for termination alleged in the petition by clear and convincing evidence and that terminating Father's parental rights was in B.L.R.'s best interest. On September 27, 2004, the trial court entered a written order setting forth its specific factual findings, in relevant part, as follows:

11. That the initial permanency plan was entered into with the parents on January 14, 2003 requiring Respondent Larry Roney would complete an alcohol and drug assessment, maintain a stable home, complete a mental health intake, and cooperate and resolve all pending legal matters.

12. That services were put into place, including alcohol and drug assessment through Terry Winbush, counseling with Elizabeth Shanklin, a psychological by Dr. Charlie Biar [sic], random drug screens, and therapeutic visitation was set up with Respondent Larry Roney.

13. That Respondent Larry Roney has tested positive for methamphetamine on numerous occasions over the past two (2) years; and that he states he has been drug-free for the past five (5) months. On September 2, 2003, Mr. Roney tested positive for methamphetamine, but stated that there was no way he could test positive because he took urine from a six-year old child to the test. This Court additionally found that there were concerns as to sexual abuse of a stepdaughter in June of 2003.

14. That the Court finds the witnesses for the Department of Children's Services are more credible than Mr. Roney.

15. That based upon the testimony of the expert witness, James E. Meeker, that Respondent Larry Roney has had a substantial history of methamphetamine usage and that he has been less than forthright about his usage of same.

. . . .

17. That Elizabeth Shanklin, LCSW testified as an expert witness; that Terry Winbush testified as an expert witness; and that Dr. Charlie Viar testified that Respondent Larry Roney did in fact have a dependence upon methamphetamine; that he would require a long-term period of stability and counseling; and that he had been noncompliant with counseling in the past. Elizabeth Shanklin testified that Mr.

-8-

Roney would have cycles of stability and then instability.[8] His prognosis was poor.

The juvenile court also made the following conclusions of law in its final order:

18. The child was found to be dependent and neglected by this Court and was placed in the custody of the Department of Children's Services; the Department made reasonable efforts to prevent removal or the child's situation prevented reasonable efforts from being made prior to removal; the Department has made reasonable efforts to assist the parent, Larry Roney to establish a suitable home for the child for a period of four (4) months following the removal, but Respondent, Larry Roney, has made no reasonable efforts to find a suitable home and has demonstrated a lack of concern for the child to such a degree that it appears unlikely that he will be able to provide a suitable home for the child at an early date.

19. The child has been removed by order of this Court for a period of six (6) months; the conditions which led to her removal still persist; other conditions persist which in all probability would cause the child to be subjected to further abuse and neglect and which, therefore, prevent the child's return to the care of the Respondent, Larry Roney; there is little likelihood that these conditions will be remedied at an early date so that this child can be returned to Respondent, Larry Roney, in the near future; and the continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.

20. Despite frequent explanations of the Statement of Responsibilities set out in the periodic foster care plans prepared for and signed by Respondent, Larry Roney, has failed to comply in a substantial manner with those reasonable responsibilities related to remedying the conditions that necessitated foster care placement.

21. Awarding legal and physical [sic] of the child to said Respondent would pose a risk of substantial harm to the physical and psychological welfare of the child.

---

[8]After reviewing every page of the transcript of the testimony presented to the trial court on August 19, 2004, we find no testimony provided by Elizabeth Shanklin. The only reference to Mr. Shanklin contained in the record is found in a letter she co-authored along with Mr. Winbush which DCS introduced as an exhibit at trial.

22. That it is by clear and convincing evidence that it is in the best interest of the child, [B.L.R.], that the parental rights of Respondent Larry Roney to the child be forever terminated and that the complete custody, control, and guardianship of the child be awarded to the State of Tennessee, Department of Children's Services, with the right to place to [sic] the child for adoption and to consent to such adoption in loco parentis.

23. That the Department of Children's Services has exercised reasonable efforts to prevent removal and reunify the family, including intensive family preservation, payment of rent, counseling, alcohol and drug assessment counseling, psychological evaluation, random drug testing, therapeutic visitation, and case management.

Father filed an appeal to this Court presenting, as we perceive them, the following issues for our review:

(1) Whether DCS established, by clear and convincing evidence, one of the grounds for terminating Father's parental rights; and
(2) Whether terminating Father's parental rights is in the best interest of his daughter.

For the reasons set forth more fully herein, we affirm in part, reverse in part, and remand this case to the trial court for further proceedings.

## II.
### STANDARD OF REVIEW

"A biological parent's interest in the care, custody, and control of his or her child is among the oldest of the judicially recognized fundamental liberty interests." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Both the United States and Tennessee Constitutions recognize that parents have a fundamental right to the care, custody, and control of their children. *Santosky v. Kramer*, 455 U.S. 745, 754 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002); *In re Swanson*, 2 S.W.3d 180, 187 (Tenn. 1999); *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn. 1993); *Ray*, 83 S.W.3d at 732. However, this is not a right which is entirely immune from state involvement. *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). A biological parent's rights regarding the custody of a minor child will continue so long as the parents have not voluntarily relinquished their rights, abandoned their rights, or engaged in conduct requiring the limitation or termination of their rights. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *Stokes v. Arnold*, 27 S.W.3d 516, 520 (Tenn. Ct. App. 2000).

Proceedings in Tennessee to terminate the parental rights of a biological parent are governed by statute. *See* Tenn. Code Ann. § 36-1-113 (2003); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn.

2002); *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 Tenn. App. LEXIS 160, at *14 (Tenn. Ct. App. Mar. 9, 2004); *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 Tenn. App. LEXIS 415, at *31 (Tenn. Ct. App. June 3, 2003). A party seeking to terminate a biological parent's parental rights must prove two things: (1) the existence of one of the statutory grounds justifying termination by clear and convincing evidence, Tenn. Code Ann. § 36-1-113(c)(1) (2003); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re C.W.W.*, 37 S.W.3d 467, 475 (Tenn. Ct. App. 2000); and (2) terminating the biological parent's parental rights is in the child's best interest, Tenn. Code Ann. § 36-1-113(c)(2) (2003); *In re A.W.*, 114 S.W.3d 541, 545 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d at 475-76.

Terminating a biological parent's parental rights is a harsh result, Tenn. Code Ann. § 36-1-113(*l*)(1) (2003), therefore, in order to prevent the unwarranted termination of parental rights, the legislature requires that a statutory ground for termination be proven by clear and convincing evidence. *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474. This Court has previously described the clear and convincing evidence standard in the following terms:

> Evidence that satisfies this heightened burden of proof eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence, *Walton v. Young*, 950 S.W.2d 956, 960 (Tenn. 1997); *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992); *In re C.D.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000). It should produce in the fact-finder's mind a firm belief or conviction regarding the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d [182, 188 (Tenn. 1995)].

*Ray*, 83 S.W.3d at 733. "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is 'highly probably' as opposed to merely 'more probable' than not. *In re C.W.W.*, 37 S.W.3d at 474 (citing *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn. Ct. App. 1981)).

Parental termination proceedings, due to their complexity and the gravity of their consequences, require individualized decision making. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004); *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004). When reviewing a lower court's decision to terminate a biological parent's parental rights, we utilize the following standard of review:

> Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c)(1), we must adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact *de novo* in accordance

with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights.

*In re M.J.B.*, 140 S.W.3d at 654 (citations omitted); *see also Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *Ray*, 83 S.W.3d at 733.

We are also mindful that, in cases of this nature, a significant portion, if not all, of the evidence is testimonial in nature. Thus, when reviewing a parental termination case on appeal, we are bound by the following principle of appellate jurisprudence:

Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). *Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics. Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells v. Tenn. Bd. Of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) (emphasis added); *see also In re R.L.H.*, No. M2002-01179-COA-R3-JV, 2003 Tenn. App. LEXIS 414, at *20 (Tenn. Ct. App. June 3, 2003); *Powell v. Powell*, 124 S.W.3d 100, 104-05 (Tenn. Ct. App. 2003); *In re Petition of Weatherford*, No. W1999-01014-COA-R3-CV, 2000 Tenn. App. LEXIS 837, at *11-12 (Tenn. Ct. App. Dec. 29, 2000); *In re M.C.G.*, No. 01A01-9809-JV-00461, 1999 Tenn. App. LEXIS 327, at *21-22 (Tenn. Ct. App. May 26, 1999).

# III.
## DISCUSSION

### A.
### *Grounds for Termination*

In its petition to terminate Father's parental rights, DCS alleged the following grounds: (1) abandonment pursuant to section 36-1-113(g)(1) of the Tennessee Code, (2) substantial noncompliance with the permanency plans pursuant to section 36-1-113(g)(2) of the Tennessee Code, and (3) persistent conditions pursuant to section 36-1-113(g)(3) of the Tennessee Code. Clear and convincing evidence of any one of these grounds is sufficient to support terminating Father's parental rights to B.L.R. *See In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Turning to the first issue presented for review on appeal, Father makes two arguments. First, Father asserts that the trial court did not make specific findings of fact regarding each ground alleged by DCS when issuing its oral order following the hearing. Although he cites to section 36-1-113(k) of the Tennessee Code in support of this position, Father has misconstrued the statute. Section 36-1-113(k) provides: "The court shall *enter an order* which makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." Tenn. Code Ann. § 36-1-113(k) (2003) (emphasis added). It is a well-established principle of law in this state that a court speaks only through its written judgments, duly entered upon its minutes. *Green v. Moore*, 101 S.W.3d 415, 420 (Tenn. 2003); *Evans v. Perkey*, 647 S.W.2d 636, 641 (Tenn. Ct. App. 1982). Thus, when this Court undertakes a review of a parental termination case, we are concerned with whether the trial court's final written order, not its oral statements to the parties, satisfies the statute. *See In re Muir*, No. M2002-02963-COA-R3-CV, 2003 Tenn. App. LEXIS 831, at \*8-10 (Tenn. Ct. App. Nov. 25, 2003). Upon reviewing the trial court's order, we have determined that it satisfies the statutory requirement so far as the grounds for termination are concerned.

Next, Father argues that the evidence presented by DCS at trial does not rise to the level of clear and convincing evidence. Father devotes the entire argument section of his brief to addressing section 36-1-113(g)(2) of the Tennessee Code, the substantial noncompliance ground for termination. Accordingly, we will first examine whether DCS carried its burden at trial of proving, by clear and convincing evidence, that Father was substantially noncompliant with the permanency plans implemented by DCS in this case.

Section 36-1-113(g)(2) provides that a ground for terminating a biological parent's parental rights exists when "[t]here has been substantial noncompliance by the parent. . .with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4." Tenn. Code Ann. § 36-1-113(g)(2) (2003). DCS is required, within thirty (30) days of a child entering foster care, to prepare a plan setting forth the goals (i.e. return to the parent, placement with a relative, adoption, or other planned permanent living arrangement) for the child. Tenn. Code Ann. § 37-2-403(a)(1) (2003). "The permanency plan for any child in foster care shall

include a statement of responsibilities between the parents, the agency and the caseworker of such agency." Tenn. Code Ann. § 37-2-403(a)(2) (2003). In addressing the substantial noncompliance ground for termination, our supreme court has stated:

> Substantial noncompliance is a question of law which we review *de novo* with no presumption of correctness. Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "of real worth and importance." Black's Law Dictionary 1428 (6th ed. 1990). *In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement.* Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant.

*In re Valentine*, 79 S.W.3d 539, 548-49 (Tenn. 2002) (emphasis added). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d 643, 657 (Tenn. Ct. App. 2004). In conjunction with making a determination as to whether there has been substantial noncompliance with the requirements in a permanency plan, the trial court must also determine that the permanency plan's requirements "are reasonable and are related to remedying the conditions which necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C) (2003); *In re Valentine*, 79 S.W.3d at 547.

In the instant case, the permanency plans implemented by DCS required Father to do the following: (1) complete an alcohol and drug assessment, follow treatment recommendations, and submit to random screens; (2) maintain a safe and stable home for at least four months; (3) complete a mental health evaluation, follow treatment recommendations, and continue with any counseling until released by the counselor; (4) resolve all pending legal issues; (5) avoid associating with known drug users and/or dealers; (6) maintain employment; and (7) obtain a driver's license. DCS explained these requirements to Father, and he signed each plan agreeing to comply with the terms. The trial court found these requirements to be reasonably related to remedying the conditions which led to B.L.R.'s placement in foster care, and we agree with that assessment.

The evidence in the record established that Father obtained a valid driver's license and established a safe, stable home for at least four months by the time of trial. While Father had resolved a significant portion of his legal issues by the time of trial, he testified that, at the time of the hearing, he was out of jail on bond pending resolution of a contempt charge. Regarding Father's employment, Ms. Green testified that Father never provided her with proof of his income. Father did provide her with a letter showing he was working at an automotive garage, and she verified this to be true. At trial, Father stated that, since the birth of his daughter, he had worked "off and on."

However, Ms. Green stated that Father did not stay employed anywhere continuously, and he "jumped from job to job." After Father worked at a particular job for a couple of weeks, Ms. Green called to verify his employment only to learn that he had either quit or been fired.

While Father's steps toward satisfying each of the aforementioned requirements sheds light on his level of compliance, or lack thereof, with the permanency plans, we must turn our attention to the most important requirements. *See In re Valentine*, 79 S.W.3d at 548-49. At trial, Ms. Green readily admitted that Father's drug use was the biggest obstacle to reunification with his daughter. As such, the permanency plans required Father to submit to random drug testing and attend drug and mental health counseling in an effort to ensure that he remained drug free.

Between January of 2003, when the first permanency plan was implemented, and November 2003, when DCS filed the petition to terminate Father's parental rights, Father tested positive for methamphetamine use five times. Father tested positive twice for methamphetamine use in February 2003, and he tested positive in May, July, and August of 2003. Dr. Meeker testified concerning the extent of Father's drug use as gleaned from the various samples taken from Father. Based on the hair samples which tested positive, Dr. Meeker was able to surmise that Father used methamphetamine on multiple occasions between April and July 2003, as well as between September and December 2003. After DCS filed the petition in this case, Father continued to test positive for methamphetamine use in December of 2003 and March of 2004. The March 2004 test was the last test to show that Father was positive for methamphetamine use. At trial, Father stated that he has remained drug free since that test was given, and he relies on subsequent tests showing negative results to support his position. Father, relying on the testimony of Dr. Viar, asserted that, if he is given another six month period to work on his drug habit, he could remain drug free.

Despite Father's assurances, the record indicates that DCS has clearly and convincingly established that Father has been substantially noncompliant with the permanency plan in this case. First, the trial court expressly found that Father was not a credible witness, and the court even discussed Father's demeanor during the proceedings when addressing the parties at the conclusion of the hearing. The trial court referred to Father's "chuckling" and displaying a "cavalier" attitude during the trial. Furthermore, not only was Father to remain drug free, but the permanency plans also required that Father attend counseling to address his addiction and mental health issues. Between January and November of 2003, Father's attendance at counseling was sporadic. In a report filed in August of 2003, Mr. Winbush described Father's progress up to that point as "superficial" and determined Father had a "poor prognosis." The record demonstrates that little has changed since that time. According to Mr. Winbush, Father stopped attending counseling altogether in March 2004 without being released by his counselors. When Father went to see Dr. Viar in April of 2004, Dr. Viar reported that Father was "quite hostile" and uncooperative. Dr. Viar also testified that, if Father were not attending his therapy sessions, he would question returning custody of B.L.R. to Father. At trial, Father freely admitted that he continued to have a problem with his methamphetamine addiction, however, the record indicates that Father has not returned to therapy

since March of 2004.[9]  Finally, Father has not addressed the mental health issues raised by the counselors during their sessions.  The evidence revealed three previous suicide attempts by Father, and Dr. Viar diagnosed Father as having major depression and antisocial personality disorder.  The record reveals that Father has not made an effort to remedy these concerns either.  In fact, Father acknowledged at trial that he is partially to blame for missing his counseling sessions.

Father's assurances at trial that, if he is given six more months to address his drug problem, he will change are "too little, too late."  *Compare In re A.R.G.*, No. M2004-00894-COA-R3-PT, 2005 Tenn. App. LEXIS 122, at *16 (Tenn. Ct. App. Feb. 25, 2005); *State v. B.L.K.*, No. E2002-01724-COA-R3-JV, 2003 Tenn. App. LEXIS 360, at *24 (Tenn. Ct. App. May 20, 2003); *In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003); *In re C.A.T.*, No. 01-A-01-9510-JV-00474, 1996 Tenn. App. LEXIS 291, at *15-16 (Tenn. Ct. App. May 17, 1996), *with In re M.J.M.*, No. M2004-02377-COA-R3-PT, 2005 Tenn. App. LEXIS 221, at *33-36 (Tenn. Ct. App. Apr. 14, 2005) (noting that a Mother's efforts were not "too little, too late" when she demonstrated that, after the petition to terminate her parental rights was filed, she continued to work diligently toward addressing her methamphetamine addiction by seeking out counseling on her own.)  Since we have determined that DCS clearly and convincingly proved the ground for termination found in section 36-1-113(g)(2) of the Tennessee Code, we need not address the remaining grounds for termination.  *See In re N.P.*, No. W2004-00345-COA-R3-PT, 2004 Tenn. App. LEXIS 879, at *13 (Dec. 23, 2004); *In re J.S.*, No. W2004-00509-COA-R3-PT, 2004 Tenn. App. LEXIS 739, at *16 (Tenn. Ct. App. Nov. 8, 2004), *cert. denied*, 2005 Tenn. LEXIS 88 (Tenn. 2005); *In re K.M.*, No. W2003-02156-COA-R3-PT, 2004 Tenn. App. LEXIS 300, at *11 (Tenn. Ct. App. Apr. 30, 2004); *State v. Darr*, No. 03A01-9706-JV-00213, 1998 Tenn. App. LEXIS 202, at *9 (Tenn. Ct. App. Mar. 24, 1998); *State v. Manier*, No. 01A01-9703-JV-00116,  1997 Tenn. App. LEXIS 755, at *18-19 (Tenn. Ct. App. Oct. 31, 1997).

### B.
### *Best Interest*

Prior to terminating the parental rights of a parent to a minor child, the trial court must also find that doing so is in the best interest of the child.  Tenn. Code Ann. § 36-1-113(c)(2) (2003).  On appeal, Father argues that the trial court failed to articulate any specific findings of fact regarding the best interest analysis required by section 36-1-113(c)(2) of the Tennessee Code.  The trial court's order provides, in relevant part, as follows:

> That it is by clear and convincing evidence that it is in the best interest of the child, [B.L.R.], that the parental rights of Respondent Larry Roney to the child be forever terminated and that the complete custody, control, and guardianship of the child be awarded to the

---

[9]Father cannot rely on his interactions with Ms. Doyer to prove otherwise.  As Ms. Doyer stated at trial, she did not keep records of her interactions with Father because he did not seek her help in a professional capacity.  According to Ms. Doyer, their relationship was not conducted pursuant to her employment but as friends.  Furthermore, Ms. Doyer admitted that she is not a licensed counselor.

> State of Tennessee, Department of Children's Services, with the right
> to place to [sic] the child for adoption and to consent to such adoption
> in <u>loco</u> <u>parentis</u>.

In *In re Muir*, No. M2002-02963-COA-R3-CV, 2003 Tenn. App. LEXIS 831 (Tenn. Ct. App. Nov. 25, 2003), this Court addressed a trial court's statutory duty to make specific findings of fact in parental termination cases, stating:

> A trial court's responsibility to make findings of fact and conclusions of law in termination cases differs materially from its responsibility in other civil cases. Generally, trial courts, sitting without juries, are not required to make findings of fact or conclusions of law unless requested in accordance with Tenn. R. Civ. P. 52.01. Termination cases, however, are another matter. Tenn. Code Ann. § 36-1-113(k) explicitly requires trial courts to "enter an order which makes specific findings of fact and conclusions of law" in termination cases. *Thus, trial courts must prepare and file written findings of fact and conclusions [of] law with regard to every disposition of a petition to terminate parental rights*, whether they have been requested or not.
>
> Tenn. Code Ann. § 36-1-113(k) reflects the Tennessee General Assembly's recognition of the necessity of individualized decisions in these cases. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999) (holding that termination cases require "individualized decision making"). It also reflects the General Assembly's understanding that findings of fact and conclusions of law facilitate appellate review and promote the just and speedy resolution of appeals. *Bruce v. Bruce*, 801 S.W.2d 102, 104 (Tenn. Ct. App. 1990). Because of Tenn. Code Ann. § 36-1-113(k), trial courts cannot follow the customary practice of making oral findings from the bench and later adopting them by reference in their final order.
>
> When a trial court has not complied with Tenn. Code Ann. § 36-1-113(k), *we cannot simply review the record* de novo *and determine for ourselves where the preponderance of the evidence lies as we would in other civil, non-jury cases.* In accordance with *In re D.L.B.*, 118 S.W.3d at 365, 2003 Tenn. LEXIS 983, 2003 WL 22383609, at \*6, we *must remand* the case for the preparation of appropriate written findings of fact and conclusions of law.

*In re Muir*, 2003 Tenn. App. LEXIS 831, at \*8-10 (emphasis added); *see also D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

In subsequent decisions, this Court, recognizing the mandatory nature of the language found in section 36-1-113(k) of the Tennessee Code, has firmly established that, when a trial court fails to perform its statutorily required duty in parental termination cases, this Court must remand the case to the trial court for the entry of written findings of fact and conclusions of law. *See In re M.J.M.*, No. M2004-02377-COA-R3-PT, 2005 Tenn. App. LEXIS 221, at *18-19 (Tenn. Ct. App. Apr. 14, 2005); *In re F.R.R.*, No. M2004-02208-COA-R3-PT, 2005 Tenn. App. LEXIS 130, at *8-9 (Tenn. Ct. App. Mar. 1, 2005); *In re M.O.*, No. M2004-01602-COA-R3-PT, 2005 Tenn. App. LEXIS 125, at *14-15 (Tenn. Ct. App. Feb. 25, 2005); *State v. C.H.K.*, 154 S.W.3d 586, 590-91 (Tenn. Ct. App. 2004); *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 Tenn. App. LEXIS 449, at *18-19 (Tenn. Ct. App. July 13, 2004); *In re M.J.B.*, 140 S.W.3d 643, 653-54 (Tenn. Ct. App. 2004); *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 Tenn. App. LEXIS 160, at *16-17 (Tenn. Ct. App. Mar. 9, 2004); *State v. McBee*, No. M2003-01326-COA-R3-PT, 2004 Tenn. App. LEXIS 85, at *14-16 (Tenn. Ct. App. Feb. 9, 2004); *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re CNR*, No. M2003-01301-COA-R3-PT, 2003 Tenn. App. LEXIS 915, at *6-8 (Tenn. Ct. App. Dec. 23, 2003). We have also noted that the statutory requirement to prepare written findings of fact and conclusions of law applies with equal force to the best interest component of parental termination cases. *See White v. Moody*, M2004-01295-COA-R3-PT, 2004 Tenn. App. LEXIS 890, at *8 (Tenn. Ct. App. Dec. 30, 2004) (noting that, when handling a parental termination case for the third time on appeal, this Court had previously remanded the case to the trial court due to its failure to enter written findings of fact and conclusions of law on the best interest factors); *In re C.D.B.*, No. M2003-00345-COA-R3-JV, 2003 Tenn. App. LEXIS 804, at *12 (Tenn. Ct. App. Nov. 13, 2003) ("The findings of fact and conclusions of law required by Tenn. Code Ann. § 36-1-113(k) must address the two necessary elements of every termination case.").

The trial court's order in this case contains a perfunctory statement that terminating Father's parental rights is in B.L.R.'s best interest. The order does not include an analysis of the factors set forth in section 36-1-113(i) of the Tennessee Code and their applicability to the facts of this case. In *White v. Moody*, No. M2004-01295-COA-R3-PT, 2004 Tenn. App. LEXIS 890 (Tenn. Ct. App. Dec. 30, 2004), *cert. denied*, 2005 Tenn. LEXIS 265 (Tenn. 2005), this Court had before it a parental termination case for the third time on appeal. *White*, 2004 Tenn. App. LEXIS 890, at *1. In the original appeal, this Court affirmed the trial court's findings regarding the grounds for termination, but, regarding the best interest analysis, we stated:

> We noted that the trial court had failed to make a specific finding that terminating Mr. Moody's parental rights was in Nicole's best interests. *Accordingly, we remanded the case to the trial court with directions to conduct a hearing regarding whether terminating Mr. Moody's parental rights was in Nicole's best interests.*

*Id.* at *8 (emphasis added). No only did this Court remand so that the trial court could comply with the requirements of section 36-1-113(k) of the Tennessee Code, but we directed the trial court to conduct a new hearing on remand. *Id.*

Regarding the actions taken by the trial court on remand, this Court stated:

> The trial court conducted two days of hearings in November 2001 and March 2002 to determine whether terminating Mr. Moody's parental rights was in Nicole's best interests. During this hearing, the trial court limited its consideration to the original record and declined to permit the parties to introduce new evidence regarding events occurring after March 2000. Ultimately, in April 2002, the trial court entered a second order concluding that terminating Mr. Moody's parental rights was in Nicole's best interests. Mr. Moody appealed again. On July 25, 2003, *we again vacated the judgment terminating Mr. Moody's parental rights after concluding that the parties should have been permitted to present evidence regarding Nicole's best interest.*

*Id.* at *9 (emphasis added). After the trial court conducted another hearing involving new evidence and entered its third order, the case came before this Court for the third time on appeal. *Id.* at *10-11. After recognizing a trial court's duty to enter written findings of fact and conclusions of law in parental termination cases, this court "determined that this case should not be remanded for the entry of written findings of fact and conclusions of law because of the inordinate delay that has already occurred in the final disposition of this case." *Id.* at *11.

In addressing the most recent order issued by the trial court in *White*, this Court noted:

> In this case, the trial court made oral findings from the bench at the conclusion of the February 12, 2004 hearing. However, it did not enter a final order until April 7, 2004, and *this order contained neither findings of fact nor conclusions of law. It simply recites that "it is in the best interest and welfare of the minor child for the Respondent's parental rights [to] be terminated and that the step-father be allowed to adopt the minor child."* Accordingly, no conclusion can be drawn other than the trial court has not complied with Tenn. Code Ann. § 36-1-113(k).

*Id.* at *12-13 (emphasis added). However, in choosing not to remand the case once more to the trial court, we stated:

> In most circumstances, the appropriate remedy for the trial court's oversight would be to vacate the judgment terminating Mr. Moody's parental rights and granting Mr. White's adoption petition and remand the case to the trial court with directions to file written findings of fact and conclusions of law in accordance with Tenn. Code Ann. § 36-1-113(k). *However, we have already been required to*

*remand this case twice. These remands have delayed the final resolution of this case by approximately three years. Incurring further delay by remanding this case a third time will not serve the interests of any of the persons who have been enmeshed in this litigation for seven long years. Accordingly, rather than remanding the case as we would customarily do, we will address the substantive merits of the trial court's conclusion that terminating Mr. Moody's parental rights at this time is in Nicole's best interests using the trial court's oral findings of fact.*

*Id.* at \*13-14 (emphasis added).

Remanding this case to the trial court will not result in the undue delay contemplated by *White*. The trial court in this case has failed to comply with the requirements of section 36-1-113(k) of the Tennessee Code in the first instance. Since the trial court reached a decision on the best interest component of this parental termination case but failed to enter specific findings of fact when doing so, we must, in accordance with *In re Muir* and its progeny, vacate the trial court's order and remand this case to the trial court for further proceedings. On remand, the trial court is instructed to enter a new order setting forth its specific findings of fact as they relate to the statutory best interest factors. If the trial court is unable to do so based on the present record, the trial court may conduct a new hearing to entertain evidence on whether termination is in B.L.R.'s best interest.

## IV.

### CONCLUSION

For the foregoing reasons, we affirm the trial court's finding that one of the grounds for terminating Father's parental rights has been established by clear and convincing evidence. However, we vacate the trial court's order due to the trial court's failure to enter the statutorily required findings of fact and conclusions of law on the issue of whether terminating Father's parental rights is in B.L.R.'s best interest. As a result, we must remand this case to the trial court for the entry of findings of fact and conclusions of law on the best interest prong. Costs of this appeal are taxed to the Appellant, Larry Roney, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE