# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 10, 2012 Session

## IN RE DEVONTA L.C. ET AL.

### Appeal from the Juvenile Court for Knox County
#### No. 96929   Tim Irwin, Judge

### No. E2012-00678-COA-R3-PT-FILED-JANUARY 31, 2013

This is a termination of parental rights case focusing on three minor children ("the Children"). The defendants are Russell C. ("Father") and Brandy C. ("Mother").[1] The Children were taken into custody by the Department of Children's Services ("DCS") in January 2008 because of repeated injuries sustained by the oldest child. DCS filed a petition to terminate the parental rights of both parents in April 2010, alleging numerous grounds for termination. Following a bench trial, the court granted the petition after finding, by clear and convincing evidence, that Father and Mother were in substantial noncompliance with the permanency plans and that the conditions leading to removal still persisted. However, the trial court found that severe child abuse was not proven. The court did find, by clear and convincing evidence, that termination is in the Children's best interest. Father and Mother appeal. We reverse in part and affirm in part. Termination of the parents' parental rights is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Reversed in Part and Affirmed in Part; Case Remanded**

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Ben H. Houston, II, Knoxville, Tennessee, for the appellant, Russell C.

Joshua Hedrick, Knoxville, Tennessee, for the appellant, Brandy C.

---

[1] Brandy C. is not the "biological" mother of the oldest child, Devonta L.C. When the Children were taken into custody, she was his stepmother and was living in the home with Father and the Children. Brandy C. is the biological mother of the two younger children.

Robert E. Cooper, Jr., Attorney General and Reporter, and Martha A. Campbell, Deputy Attorney General, Office of the Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.

The Children are Devonta L.C. (DOB: March 14, 1998), Nakila A.M.C. (DOB: October 23, 2002), and Tavius E.C. (DOB: March 29, 2004). DCS first became involved with the Children in December 2007 when teachers and others at Devonta's school noticed that he had a strange pattern of bruising on his back and other marks/bruises. Numerous teachers, the school nurse, and the school's "Project Grad" campus manager reported that Devonta frequently came to school with marks/bruises, was often dirty and hungry, and usually slept through most of the morning. In December 2007, Devonta got in trouble at school and was suspended. Devonta reacted tearfully, telling the campus manager that if they sent him home, Father would beat him.

When Devonta returned to school, he complained that his back hurt. Personnel there noticed that Devonta had several circle-shaped marks on his back that looked like bruises or burns and a "knot" on his head. Devonta was seen by a nurse, and the Knoxville Police Department and DCS were notified.

The DCS worker who investigated the abuse allegations noted that the circular bruises on Devonta's back were aligned in a pattern, and also that Devonta had a greenish-colored bump on his head, a large healing wound on his hand, a swollen ear, and scratch marks. She testified that Devonta first told her he got into a fight on the playground, but later, following further questioning, he said that Father had hit him with a belt. Devonta described a white belt with metal grommets and drew a picture of it. The worker stated that Devonta was very nervous and reluctant to talk, stating that Father told him not to mention the incident. Devonta also stated that Father was trying to "toughen him up," and that he, Devonta, deserved to be punished because he tried to set the house on fire.

The DCS worker went to the home and talked to the parents. Father admitted that he sometimes whipped Devonta with the belt he was wearing. It was a plain, leather belt. The DCS worker asked for consent to search the home, and found a white belt with metal grommets hidden in the laundry room that matched the one described by Devonta. The parents were interviewed separately, and Father said he had never seen the belt before. Mother admitted it was her belt, but denied using it to hit Devonta. Father then volunteered

that Mother called him at work a few days before the DCS interview and said she had given Devonta a whipping with a belt.

Devonta was taken to the hospital to have his injuries assessed. While there, his paternal grandmother came to see him and helped him get dressed. She asked him about the marks on his back and Devonta shouted, "Brandy did it." Devonta and his siblings were sent to stay with the paternal grandparents for a few days, and then returned home with an Intensive Family Protective Services worker in place. The DCS worker reported that the conditions in the home were deplorable, as there was garbage and dirty dishes "everywhere," roaches running about, food smeared on the floor, and so much dirty laundry that the floor of the bedroom was not visible. A few weeks later, on January 8, 2008, the school again called DCS to report that Devonta came in with a large knot on his head. Devonta reported that one of his parents shoved his head into a wall. The Children were taken into custody at that time.

The Children were placed in foster care and permanency plans were developed for each with both parents. The permanency plans required Father and Mother to follow the court's orders and attend all hearings, attend team meetings and school meetings, meet with DCS on a regular basis, allow home visits, and pay child support. The parents also were required to demonstrate appropriate parenting skills and to learn how to appropriately discipline children. They were also directed to cooperate with the service providers. Father and Mother were further required to: participate in therapy, both individually and as a couple; maintain a clean, safe home free of domestic violence; and visit the Children. Later permanency plans added the requirements that the parents participate in group therapy; understand the effects of abuse on the Children and prevent further abuse; undergo an alcohol/drug assessment and follow all recommendations; and obtain psychological evaluations and carry through with any recommendations.

On April 14, 2010, DCS filed a petition to terminate the parental rights of Father and Mother. DCS asserted that the parents had committed severe child abuse, that they were in substantial noncompliance with the permanency plans, and that the conditions leading to removal still persisted. DCS also alleged that termination was in the Children's best interest. A trial on the petition was held over a number of days. At the close of DCS's proof, the court dismissed the severe abuse allegation. At the end of the trial, the court ruled that DCS had proven, by clear and convincing evidence, that both Father and Mother were in substantial noncompliance with the permanency plans, and that the conditions leading to removal still persisted. The court also found, by clear and convincing evidence, that termination was in the Children's best interest. Father and Mother filed timely appeals.

II.

The parents present the following issues for our review:

> 1. Whether the trial court erred in finding persistent conditions as a basis for termination where DCS failed to enter a copy of the adjudicatory order from the dependency and neglect proceedings into evidence.
>
> 2. Whether the trial court erred in terminating the parental rights of Father and Mother when the evidence demonstrated that DCS failed to make reasonable efforts to reunify the Children with the parents.
>
> 3. Whether the trial court erred in terminating the parental rights of Father and Mother when DCS failed to prove persistence of conditions by clear and convincing evidence.
>
> 4. Whether the trial court erred in terminating the parental rights of Father and Mother when DCS failed to prove substantial noncompliance by clear and convincing evidence.
>
> 5. Whether the trial court erred by finding that termination was in the Children's best interest.

DCS asserts its own issue, *i.e.*, whether the trial court erred when it dismissed the severe abuse ground.

III.

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." ***In re F.R.R., III***, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. ***Id.***; Tenn. R. App. P. 13(d). Great weight is accorded the trial court's determinations of witness credibility, which shall not be disturbed absent clear and convincing evidence to the contrary. *See **Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002).

Questions of law are reviewed de novo with no presumption of correctness. ***Langschmidt v. Langschmidt***, 81 S.W.3d 741 (Tenn. 2002).

As this Court has stated:

> It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

***In re Angelica S.***, E2011-00517-COA-R3-PT, 2011 WL 4553233 (Tenn. Ct. App. E.S., filed Oct. 4, 2011)(citations omitted).

IV.

A.

We elect to address the issue of severe child abuse first. DCS argues that the court erred in dismissing the ground of severe child abuse because, in the judgment of DCS, there was overwhelming proof that the Children had been subjected to abuse/neglect while in the parents' custody, abuse that was likely to cause serious bodily injury or death. DCS also argues that the Children were subjected to abuse/neglect that, in the opinion of qualified experts, had caused severe developmental delay or retardation, or severe impairment of the Children's ability to function adequately.

At the close of DCS's proof, the parents' separate attorneys made oral motions asking the court to dismiss the severe child abuse allegations. The trial court reviewed Tenn. Code Ann. §37-1-102 (Supp. 2012), and the definition of severe child abuse contained in that statute. The trial court then stated that the only specific act of abuse that was proven was the

"improper whipping" by Mother, and that this was not sufficient to rise to the level of severe child abuse. The court noted that there was doubt in its mind as to the cause of the injuries shown. Because of this doubt, the court refused to terminate on the severe child abuse allegation.

B.

Tenn. Code Ann. §37-1-102(b)(23) defines "severe child abuse" as:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
>
> (ii) "Serious bodily injury" shall have the same meaning given in §39-15-402(d).
>
> (B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct.

Tenn. Code Ann. §39-15-402(d) (Supp. 2012) defines "serious bodily injury to the child":

> includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

The trial court apparently believed that the wording of these statutes did not allow it to find severe child abuse based on circumstantial evidence, and that without direct proof that the parents committed specific acts of abuse which caused the damage shown, severe child abuse could not be found. This approach fails to recognize that decisions from this Court have found severe child abuse based not on specific, proven acts of abuse, but rather on the

"combined weight of the facts." *See In re S.J.*, No. W2011-01690-COA-R3-JV, 2012 WL 3228729, *15 (Tenn. Ct. App. W.S., filed Aug. 9, 2012).

In the case of *In re S.J.*, the parents were alleged to have committed severe child abuse because their daughter had suffered skull fractures with no reasonable explanation, and then their infant son had suffered unexplained rib fractures, a severe fracture of the femur shortly thereafter, and had also been diagnosed as failing to thrive. *In re S.J.*, 2012 WL 3228729 at *1-3. The parents denied being the perpetrators of any abuse. The parents stated that their daughter (who was three months old at the time) had fallen off the couch. The medical providers found this explanation suspicious, since the child had fractures on both sides of her head, a contusion, and bleeding on her brain. *Id.*

About one year later, the parents in *In re S.J.* had a son, and he was diagnosed at age four months as failing to thrive as he was severely underweight. The pediatrician who examined the infant at the hospital also discovered numerous broken ribs in various stages of healing. The parents had no explanation for the fractures, and an investigation was opened by DCS. Approximately one month later, while the investigation was still pending, the infant son was transported to the hospital and diagnosed with an acute femur fracture. Mother explained that the child's leg had gotten caught in the crib slats and that she had pulled his leg out. The pediatrician found this explanation to be questionable, and the children were taken into DCS custody. *Id.* At trial, the mother testified that she had discovered she had been mixing the infant's formula incorrectly, and that this was the reason for his malnutrition. She testified that she did not know how his ribs got fractured, but thought perhaps it occurred during childbirth or when someone picked him up. She repeated her story about the child's leg being caught in the crib slats as an explanation for the femur fracture. *Id.* at *3. The treating pediatrician testified that the child weighed only nine pounds at four months of age, and was below the third percentile for weight. She testified that tests were performed and no medical reason was found for the child's failure to gain weight. The pediatrician testified that the child gained weight very well during his hospitalization. The pediatrician went on to explain that such malnourishment could affect brain development and lead to serious cognitive delays. *Id.* at *4. Regarding the rib fractures, the pediatrician testified that there were six separate fractures, and that they were in different stages of healing at the time of examination. The pediatrician testified that there was "no way" that the child could have inflicted these injuries on himself, and that they had to be the result of non-accidental trauma. She elaborated that the type and location of the fractures indicated someone had squeezed the baby "really hard, front to back. . .." *Id.* at *5. Finally, the pediatrician testified that the leg fracture was "really significant" because it occurred at a high point, near the upper end of the femur, rather than in the middle of the femur at its weakest point. *Id.* at *7. The pediatrician noted that a high fracture of this type was normally indicative of abuse or non-accidental trauma. The pediatrician stated that it

was "always a possibility" that the fracture occurred in the manner mother described, but that it was very unlikely. *Id.* at *11.

The trial court declined to find severe child abuse in that case, and DCS appealed. This Court reviewed the definition of severe child abuse contained in the statute, and began our analysis by stating:

> This case presents a textbook example of the confluence of circumstances that are presented with unfortunate regularity in cases of alleged child abuse. A preverbal infant or child sustains serious injuries, the only witnesses to the injuries are the parents or caregivers who maintain that the injuries result from an innocent misunderstanding or inexplicable mystery, and testimony by medical personnel whose role is to opine as to the most likely cause of the child's injuries, not to identify the perpetrator. We will analyze the proof in this case, applying the clear and convincing evidence standard to the statutory definition of "severe child abuse." As explained below, the evidence in this record clearly and convincingly shows severe child abuse of infant J.J.
>
> Under the clear and convincing evidence standard, it is important to "distinguish between the specific facts found by the trial court and the combined weight of those facts." Each specific underlying fact need only be established by a preponderance of the evidence. Such specific underlying facts include whether a particular injury suffered by the child was the result of nonaccidental trauma, and whether the caregiver's conduct with respect to the injury was "knowing." Once these specific underlying facts are established by a preponderance of the evidence, the court must step back to look at the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse.
>
> It is also important to understand the threshold for finding that a parent or caregiver's conduct was "knowing." In child abuse cases, the parent or caregiver may deny that the injury was purposefully inflicted, and where the injuries are inflicted on preverbal infants and children, there is often no witness to the injury other than the parent or caregiver. The "knowing"

-8-

element can and often must be gleaned from circumstantial evidence, including but not limited to, medical expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver. Moreover, "knowing" conduct by a parent or caregiver is not limited to conduct intended to cause injury:

> The term "knowing" as used in Section 37–1–102(b)(23) is not defined by statute. . .. In the context of the dependency and neglect statutes, the term has been described as follows:

>> We consider a person's conduct to be "knowing," and a person to act or fail to act "knowingly," when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her.

*In re S.J.*, 2012 WL 3228729 at \*12-13 (citations omitted).

This Court went on to analyze the evidence, noting that the pediatrician had testified that the parents' explanations for the child's injuries were improbable, and that the injuries sustained by the child were most likely caused by non-accidental trauma. The Court thus found that the evidence supported a finding that the mother either knowingly inflicted the injuries or knowingly failed to protect him from them. Similarly, the Court found that the mother's explanation for the child's malnourishment was unlikely, given the fact that she had two older children and was thus an "experienced parent" who had not shown any indication that she suffered from an intellectual impairment. The Court thus found that mother had knowingly neglected to meet the child's nutritional needs, and that this neglect was likely to cause serious bodily injury. *Id.* at \*14. While observing that the trial court's findings of credibility were entitled to deference on appeal, this Court noted that the trial court declined to credit the mother's excuses for the child's condition, and instead credited the testimony of the medical expert. The trial court apparently based its ruling declining to find severe abuse on the fact that the medical expert testified that it was "possible" that the femur fracture occurred in the manner described by Mother, even though it was unlikely. This

Court explained, "This portion of Dr. Lakin's testimony is noteworthy, but does not preclude a factual finding that J.J.'s femur fracture did not occur in the way Mother described." *Id.* at \*15. This Court adduced that "the expert testimony need not exclude every other conceivable possibility." *Id.* After considering the "combined weight of the facts" on the issue of whether they "establish clearly and convincingly that the parent committed severe child abuse," this Court found that they did, even in the absence of an admission by the parents or direct evidence. *Id.* at \*16. Based on this finding, the Court reversed the trial court on the severe abuse issue.

Similarly, in the case of *In re M.O.*, 173 S.W.3d 13 (Tenn. Ct. App. 2005), the child's father was accused of severe child abuse, conduct he denied. The trial court disagreed and terminated the father's parental rights. The father appealed to this Court, arguing that the clear and convincing burden of proof could not be satisfied by circumstantial evidence. *Id.* at 19. This Court disagreed with that assertion, explaining that "the law does not distinguish between direct evidence and circumstantial evidence as far as probative value is concerned." *Id.* at 20. We went on to state that any material fact could be proven by either direct or circumstantial evidence, and that in certain instances, circumstantial evidence could be more convincing than direct evidence. *Id.*

This Court discussed the evidence of abuse in that case, stating that it was largely circumstantial, but that this was not surprising, as "abusive acts are rarely performed in public" and because abusers "rarely confess their guilt." *Id.* The Court reviewed the proof presented, as follows: six DCS employees and the foster mother recounted the child's statements that her father and his brothers abused her; the father made inconsistent statements about what happened; experts opined that the child had been sexually abused; the child acted out sexually following visits with father; the child had knowledge of sexual acts far beyond the knowledge of most children her age; and other facts. This Court determined that the only reasonable conclusion to be drawn from this proof was that there was clear and convincing evidence that father committed severe child abuse, either by engaging in sexual abuse himself and/or failing to protect the child from sexual abuse by his brothers. This Court affirmed the trial court's finding that there was clear and convincing evidence of severe child abuse.

In another case where the trial court found, largely in the absence of direct evidence, that the parent had committed severe child abuse, the mother argued that the trial court erred in holding that there was clear and convincing evidence to support this finding. *In re Malichi C.*, E2009-00055-COA-R3-PT, 2009 WL 3270178 (Tenn. Ct. App. E.S., filed Oct. 13, 2009). The proof consisted of the testimony of the foster parents and other witnesses that the child, who was about three years of age, sexually stimulated himself by rubbing his genitals against objects on a fairly regular basis. The witnesses also testified that the child would try to fondle women's breasts, and would try to kiss women on the mouth. The foster

parents testified that when the child was being bathed, he touched his genitals constantly, and that he also committed a sex act with a life-sized Superman doll. The foster father testified that the child told him that the child's mother put her finger in his anus, and that the foster father also had caught the child's mother engaged in sexual intercourse with a man while the child was in the room. 2009 WL 3270178, at *2-3. The child's therapist testified that she had diagnosed the child with PTSD[2] and sexual abuse. She testified that her diagnosis was based on the child's exhibited anger, flashbacks, unrealistic fears, compulsive behavior, violent tendencies, and compulsive masturbation. The therapist also testified that the child told her that his mother had stuck her finger in his bottom. The child's mother denied all allegations of abuse and explained that the child would make up lies when he wanted attention. Mother denied that the foster father caught her having sex with the child in the room and insisted instead that she and the young man were just kissing. The trial court found that there was clear and convincing evidence of severe child abuse and terminated mother's parental rights. *Id.* at *5.

On appeal, mother argued that the diagnosis of PTSD was erroneously used as a basis for finding severe child abuse when it could have been caused by something other than abuse. She also argued that the testimony about the child acting out sexually was not linked to anything she had done, and further that the child's symptoms could have been caused by something done to him by the babysitter. This Court disagreed, finding that "the trial testimony . . . clearly paints a picture of a troubled boy who is sexually compulsive, fearful, apprehensive, and sometimes violent" and "this court is convinced that the child was a victim of severe child abuse that impairs his ability to function." *Id.* at *12. The Court based its finding on the "combined weight of the facts" and affirmed the termination of mother's parental rights. *Id.* at *13.

C.

Likewise, in this case, by looking at the combined weight of the facts, it is evident that the trial court erred in failing to find that there was clear and convincing evidence of severe child abuse. A plethora of witnesses from Devonta's school testified regarding his condition. They described common, weekly bruising, the fact that he regularly came to school late and was hungry and dirty, the fact that he often wore the same clothes for days in a row, and the fact that he slept in class (even standing up) and could not interact normally with his peers. One teacher stated that she had never seen another child with as many marks/bruises as Devonta exhibited. When Devonta was suspended for acting out, a witness testified that he cried and begged them not to send him home or Father would "beat him." Devonta then returned to school after the suspension with suspicious circular marks on his back and other

---

[2]Post Traumatic Stress Disorder.

injuries, which were determined by medical experts to be the result of non-accidental trauma. Devonta identified that he was whipped with a belt with metal grommets and described the belt in great detail. The exact belt was found at his home.

Devonta returned home with intensive in-home services, but came to school a few weeks later with another large bruise and knot on his head. Devonta reported that his parents had slammed his head into a wall, and that this was the cause of his injury. At this point, the Children were taken into custody. The first foster parents reported that the Children were happy to be at their home, and Devonta asked if the bathtub was clean so he could take a bath. The foster parents testified that the Children were dirty, had dirty underwear, and smelled bad. Nakila was reported to have a large bruise on her head as well.

While in foster care, the Children consistently reported having been abused by Father and Mother. Devonta reported being beaten, choked, slammed against walls, and made to stand in the corner with his arms up for hours. Devonta stated that if he went to sleep, Father and Mother would throw pennies at him to keep him awake. Nakila corroborated Devonta's statements, and also reported that she had been beaten, and that she and Tavius had been locked in a closet. Tavius reported that an injury on his leg came from Mother cutting him with a knife.

The Children almost immediately began to display severe behavioral problems and were very violent and aggressive in their play, often cursing and describing sexual acts that should have been well beyond their knowledge. The Children all acted out sexually, on themselves and each other. Devonta reported that Mother's father (Mr. A.) had raped him. DCS investigated and "indicated" Mother's father as a sexual abuser. Devonta began to hallucinate and hear voices telling him to commit acts of violence. He was put in Peninsula Hospital for two weeks. Devonta's symptoms and behavioral problems were so severe that he was eventually reclassified as a "level three" foster child, meaning that he had to be placed in a foster home that could give him the highest level of care and supervision.

Nakila and Tavius also displayed extreme symptoms and behaviors, causing problems in their first foster placement. The Children were put in therapy. Devonta and Nakila were both diagnosed with PTSD and Reactive Attachment Disorder. Tavius was diagnosed with Adjustment Disorder, anxiety and depression. All three Children exhibited what the psychological experts described as "classic" signs of abuse, such as smearing feces, dysregulation/inability to control their own bodies, sexual acting out/excessive masturbation, dissociation/ "spacing out", high levels of fear/anxiety, and aggression. Devonta was described as always worried about something hurting him, and was unable to engage with other people, even his family. The witnesses testified that he would eat until he threw up and scratch himself until he made sores. He hurt a bird, threatened to kill a teacher, threatened

to kill Tavius, and acted out sexually on other children. Devonta stated to numerous witnesses that he had been abused, and all of the witnesses found his accounts credible and consistent through the years.

Nakila and Tavius were described as "out of control" and dysregulated – they went from one emotional extreme to another very quickly. They would go up to complete strangers and hug them and say "I love you." They would curse and engage in violent play, often depicting guns and killing. Nakila would have screaming tantrums for hours, would compulsively masturbate, and would regress from talking to simply moaning. Nakila would dissociate or "space out" for long stretches of time. Tavius would be aggressive and violent in his play, cursing and using foul language. Tavius also had a very high pain tolerance, which was described as unusual and a matter of concern for a child his age. Nakila and Tavius would act out sexually with one another, and the foster homes had to install door alarms on their bedroom doors to keep them from getting in bed together at night.

All three children described specific instances of physical abuse by the parents, and all three confronted the parents about the abuse in therapy. Nakila also described that she was sexually abused by Father, and depicted the abuse by rubbing her hand in a circular motion on her groin. The Children interacted with several different caseworkers, foster parents, and therapists, all of whom testified that they believed the Children's stories of abuse, and that the stories were consistent. The family therapist noted that when the Children confronted Father and Mother in therapy, Father and Mother called them liars, and would react harshly. Father and Nakila were described as getting into extreme verbal confrontations, and the therapist would have to make them stop. The Children did not want to visit the parents, and often refused to sit by the parents or interact with them. Nakila would hide under a table, or run down the hall screaming. Devonta would refuse to stay in the room, finding any excuse to leave and go somewhere else. Tavius once experienced an "encopretic" event during therapy, where he was so fearful that he involuntarily defecated. The therapists testified that the Children's reactions to the parents and their behaviors/symptoms were all indicative of abuse, and that there was no other reasonable explanation.

Expert witnesses testified that Devonta showed signs of psychosis which could also be the result of suffering head injury/trauma. Dr. Peter Young, a psychologist and neuropsychologist, testified that he performed testing on Devonta, and that Devonta scored low on the intelligence test, and definitely showed impairment. Dr. Young related that when he asked Devonta to draw a picture of his choice, Devonta drew a "maniac shooting somebody and laughing." Dr. Young testified that Devonta had dementia due to trauma and brain damage, and that he "presented a lot like kids from Eastern European orphanages," who were given no nurturing, such that their brains did not develop normally. Dr. Young testified

-13-

that Devonta was severely impaired, likely as a result of neglect and abuse which had caused brain damage. He testified that an MRI was done on Devonta's brain at seven months of age, and it was normal. He and a medical doctor both testified that Devonta's more recent MRI showed brain damage. Dr. Young testified that something significant had happened to Devonta between the time of the two MRIs.

Dr. Young also tested Tavius, and found him to be impaired as well. Dr. Young testified that Tavius had no trust, therefore he could not "slow down" long enough to perform a task. Dr. Young related that Tavius was very disconnected and simplistic, and tended to show somatization, *i.e.* where emotional problems manifested as physical symptoms. Dr. Young testified that Tavius' impairment was caused by the environment in which he grew up.

Dr. William Allen tested/examined Nakila, and also found her to be developmentally delayed. He described her as having depression with psychotic features. The medical doctor who examined Devonta and his MRI that was performed in September 2008 stated that the MRI was abnormal, and that this was most likely the result of trauma.

A very notable fact that was shown through the testimony of several witnesses was that after the Children came into custody, the constant bruising stopped. Likewise, Devonta gained weight, and was no longer described as "skinny" like he had been before coming into custody.

A social worker who consulted on the case testified that since there was no question that Father and Mother were the primary caretakers before the Children came into custody, the trauma which caused the Children's PTSD and attachment disorders had to have happened as a result of the parents and their parenting. She also testified that it was very unlikely that the Children could have been "coached" to make the same statements to multiple people over a period of months or years. The DCS investigator who initially investigated the abuse allegations testified that DCS had nine referrals on the Children in a two-month period. She also testified that she was able to confirm Devonta's claims through her investigation, such as the white belt with grommets found in the home, and the fact that crack cocaine was found when they searched Mr. A.'s home, just as Devonta had related.

Dr. Perales, an expert in child abuse pediatrics, testified that she had reviewed Devonta's medical records and the photographs that were taken of his injuries. Dr. Perales testified that the photographs showed pattern bruising that was consistent with the belt explanation. She testified that the belt whipping would have had to have been done with great force to cause the bruising displayed in the pictures. Dr. Perales also testified that the bruises were of different ages, showing that they were the result of beatings with the belt

more than once. Dr. Perales stated that the bruise and knot on Devonta's head was consistent with his description of having his head slammed into a wall. She testified that the injuries were definitely the result of non-accidental trauma. Dr. Perales testified that abuse and neglect could affect brain development, and could cause PTSD, brain injury and behavior problems. She concluded that the Children's psychological diagnoses would support a finding that they were abused.

In the face of this overwhelming body of evidence, the trial court still declined to find severe child abuse. The trial court's finding was not based on credibility, as the trial court credited the testimony of the witnesses regarding abuse and neglect of the Children.[3] The trial court's reluctance to find severe child abuse seems to have stemmed from two sources, (1) allegations that Devonta got in fights after school which could have caused bruising/injury, and (2) the lack of a proven "specific act" by Father or Mother other than the "improper whipping." As stated earlier, however, our case law mandates that the court should look at the "combined weight of the facts" to determine if severe child abuse has been shown. *In re S.J.*, 2012 WL 3228729 at *15.

Severe child abuse requires a showing that the parent knowingly exposed the child to abuse or neglect that is likely to cause serious bodily injury or death, either by using force on the child or failing to protect a child from such abuse/neglect. Tenn. Code Ann. §37-1-102(b)(23). Serious bodily injury includes concussions/brain contusions, which were shown in this case, as well as severe bruising by whipping a child with an object, which was also shown. Tenn. Code Ann. §39-15-402(d). The proof established that Devonta sustained serious bodily injury while in the custody of Father and Mother, and no reasonable explanation was shown for those injuries other than abuse. Even if the trial court did not believe that it was definitely shown that the parents inflicted the injuries, it was clearly shown that the injuries occurred "on their watch" and that they failed to protect Devonta from being injured.

Likewise, severe child abuse is also defined as "specific brutality, abuse, or neglect . . . that in the opinion of qualified experts has caused . . . severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, *and the knowing failure to protect a child from such conduct.*" Tenn. Code Ann. §37-1-102(b)(23)(emphasis added). Once again, the trial court declined to find severe abuse because the only "specific act" proven was that of Mother whipping the child with a belt. The overwhelming evidence, however, shows that the Children were either abused or

---

[3] The trial court noted that Devonta was described as lying frequently, but that the other two children were not described this way.

neglected in such a way that many qualified experts opined that it had caused the Children to have severe disorders, depression, developmental delay/intellectual disability, and impairment of the Children's ability to function in their environment. Therefore, even if the trial court did not feel that it could find more than one "specific act" perpetrated by the parents, they were, at a minimum, guilty of failing to protect the Children who were in their care.

The trial court interpreted the statute too strictly. A great deal of direct and circumstantial evidence was shown in this case to establish that the Children were severely abused/neglected and severely damaged as a result, all while the parents had custody. The combined weight of the facts in this case clearly shows that Father and Mother were guilty of severe child abuse, and the trial court erred in failing to find accordingly. Thus, we reverse the trial court on this issue, finding that clear and convincing evidence establishes the ground of severe child abuse as a basis for terminating the parental rights of Father and Mother. Tenn. Code Ann. §36-1-113(g)(4) (Supp. 2012).

V.

We will next consider the issues raised by the parents regarding persistent conditions and substantial noncompliance, although only one ground must be proven by clear and convincing evidence to justify termination. *In re Audrey S.*, 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005).

The trial court found by clear and convincing evidence that Father and Mother were in substantial noncompliance with their permanency plans. *See* Tenn. Code Ann. §36-1-113(g)(2). The court found that the goals of the plans were appropriate and in the Children's best interest, and that the responsibilities were reasonable and related to remedying the conditions necessitating foster care. This finding has not been disputed.

The court found that one of the major requirements of the plans was for the parents to "consistently demonstrate appropriate parenting techniques." The court found that this was never accomplished, and the proof bears this out. As the trial court noted, neither parent seemed able to understand how severely damaged the Children were, or the level of care that would have to be given in order to effectively parent them.

The first case manager testified that Father and Mother displayed inappropriate parenting skills during their visits with the Children. She testified that Father was too harsh. She described an incident where he chased Tavius around pretending to be a bee (which Tavius was terrified of) until Tavius was crying and begging him to stop. She described another incident where Nakila was lying on the floor, and Father got a ball and repeatedly

-16-

and forcefully bounced it on the floor right next to Nakila's head, to see if it would scare her. She testified that Mother would dissociate during visits, and could not provide boundaries or discipline. The case manager testified that the parents never acknowledged the Children's symptoms/problems, and also never acknowledged that Mr. A. had sexually abused Devonta. She testified that during the time she worked with the family, the parents showed no improvement in their parenting skills. She opined that they could not parent for an extended period of time without reverting to abuse.

The next case manager testified that the visits between the parents and Children were always difficult, and seemed to get worse over time. She testified that Mother still relied on her father quite a bit, and had not made any progress in dealing with her father and the sex abuse allegations. She testified that it would be difficult for Mother not to have the Children around him. Another case manager testified that the parents never showed that they could implement proactive and appropriate discipline or boundaries. The worker testified that while Mother completed non-offender sex abuse classes, Mother was never willing to believe that her father did anything to Devonta. She testified that Mother also did not tell her new boyfriend, who has a young daughter, about the sexual abuse allegations against her father. The boyfriend became angry when the case manager told him because he had allowed his daughter to go to Mr. A.'s house. The case manager also testified that Father accepted no responsibility for anything, and maintained that the Children were fine before they came into custody, despite the testimony of the teachers and school officials to the contrary.

The latest caseworker assigned to Nakila and Tavius testified that they never wanted to visit with Father and Mother, and that their behaviors would escalate around the time of the visits. She testified that Nakila's relationship with Father had only gotten worse, and that Nakila was clearly afraid of him. She further testified that, since the worker had the case, the Children regularly referred to Father and Mother by their first names.

The family therapist likewise testified that she did not think Father and Mother could parent effectively because Father was too aggressive and confrontational and Mother would not stand up for the Children or protect them. She testified that Father was diagnosed with Narcissistic Personality Disorder, and that this meant he had a grandiose sense of self, could be manipulative and deceitful, and had a lack of empathy for others. The family therapist testified that the parents made little progress toward displaying appropriate emotion or demonstrating effective communication.

Another counselor who worked with the family stated that the Children had a weak attachment to the parents. She testified that Nakila, for example, was uncomfortable with Father and did not try to engage with him. She testified that Nakila tried to engage with Mother, but Mother would dissociate and withdraw.

The testimony of Father and Mother was very telling. Father testified that he and Mother had divorced and he was living with his sister. Father admitted that, while he did not have appropriate housing for the Children at the time of trial, he thought he could get housing with some assistance. Father admitted that he was 16 and Devonta's biological mother was 12 when they met, and she was only 15 when she had Devonta.

Father first testified that Devonta was a "happy kid" before his removal. He testified that he only saw the Children about 45 minutes a day because he worked so much. Father testified that Devonta could be manipulative, and did tell "fibs". Father testified that Devonta was clumsy, and got in fights after school. Father testified that he never saw anything in the Children's behavior that concerned him, although he admitted that Devonta once put a drill to Nakila's head and turned it on, and the only thing that kept it from penetrating her skull was that it got caught in her hair. Father testified that Nakila was normal, but then admitted that they often caught her masturbating. Father testified that he didn't believe that Mr. A. sexually abused Devonta at first, but now he does. He said that Mr. A. may have abused Nakila as well.

Inexplicably, Father then testified that Devonta was unhappy at home, and would not interact with the family. Father opined that this was because he worked so much and Devonta's biological mother was not there. Father testified that he did not believe, however, that the Children had PTSD or attachment disorders. Father was shown the photos of Devonta's injuries. He testified that Mother told him she whipped Devonta with a belt, and that he was squirming and the belt accidently hit his back. Father had no explanation for the other injuries, except to say that Devonta often got into fights. Father admitted that he never tried to find out if Devonta was getting picked on or to otherwise do anything about the "fights." Father later testified that he remembered Devonta tripping over a vacuum cleaner in the hallway and hitting his head, and thought that might explain the bruise on his head. When Father was asked why he thought the Children made the allegations against him and Mother, he testified that he thought they were coached. Father admitted that he did not really know what problems the Children had, or what he needed to do to be a better parent, except not use corporal punishment.

Mother testified that she was 17 when she met Father, and he was 23. She testified that she got pregnant with Nakila at age 19 and they got married. Mother testified that Devonta came to live with them when he was about two and a half years old. Mother testified that it was hard to get Devonta to obey, but she only whipped him maybe two times, and would usually put him in time out. Mother testified that she had also seen Father whip Devonta with a belt. Mother testified that she could not remember the occasion that Father described when he said she called him at work and told him she had whipped Devonta.

-18-

Mother testified that the Children had no unusual behavior problems before they went into custody. Mother admitted that she had seen Nakila masturbating. Mother testified that she did not believe her father did anything to Devonta. She testified that she would keep the Children away from him anyway.

Mother testified that she did own a white belt like the one that had been described, but she could not remember if she whipped Devonta with it. When shown the photographs, Mother testified that she did not know how Devonta got the marks and bruises on his body. Mother testified that Devonta told her he got in fights, and she also related the story about him tripping over the vacuum cleaner. Mother testified that she was now living in a two bedroom house that her grandmother left to her. She testified that she was not seeking custody of Devonta, but that if Nakila and Tavius were returned to her, she would let them each have a bedroom and she would sleep on the couch. Mother testified that she worked third shift at Kenjo Market, and would have to rely on her sister for help with the Children. Surprisingly, Mother testified that Nakila and Tavius did not lie much, so they should be believed if they said there was abuse/neglect in the home.

Father and Mother had not completed one of the major requirements of the plans, *i.e.* to "consistently demonstrate appropriate parenting techniques." Numerous witnesses who worked with the family testified that Father and Mother were simply unable to effectively parent the Children, even after DCS worked with them for over two years. The parents were required to understand the effects of abuse on Children and try to prevent further abuse, but neither parent was ever willing to admit that he or she had any responsibility for the abuse. The parents could not show, even for less than two hours every two weeks, that they could effectively or appropriately parent or discipline the Children, or provide for their emotional needs. The parents maintained that the Children were fine before they came into custody, when the proof showed this not to be true. The parents refused to acknowledge that they had any responsibility for the Children being in custody, and did not seem to know how to do anything differently. The parents did not have appropriate homes for the Children. They did not understand the Children's problems or what type of care they needed. Mother testified that she still did not believe that her father had done anything to Devonta. In short, the parents simply failed or refused to grasp what would be required of them to parent the Children, and the Children have suffered enough damage while in the custody of the parents. The evidence does not preponderate against the trial court's finding, said to be made by clear and convincing evidence, that the termination of Father and Mother's parental rights was warranted because of substantial noncompliance with the permanency plans.

The trial court found, as a ground for termination, clear and convincing evidence of "persistence of conditions" as defined in Tenn. Code Ann. § 36-1-113(g)(3), which provides as follows:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> A. The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> B. There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> C. The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early interaction into a safe, stable and permanent home;

The parents argue that the evidence is deficient in that, according to them, it fails to show that "the children have been removed from the custody of the parents *by order of the court* for no less than six months before the termination action was initiated." ***In re Zmaria***, M2009-02440-COA-R3-PT, 2010 WL 3328009 at *10 (Tenn. Ct. App. M.S., filed Aug. 24, 2010) (emphasis added) (citing Tenn. Code Ann. § 36-1-113(g)(3)). The parents are correct that there is no order in the record reflecting whether and when the trial court found the Children to be dependent and neglected. Because of the absence of such an order, there is no evidence of an essential element of a "persistence of condition" claim. Therefore, the evidence preponderates against a finding of persistence of conditions. We reverse the trial court's determination that termination is appropriate under this ground.

VII.

The parents also argue that DCS failed to make reasonable efforts to reunify them with the Children. The trial court found, however, that DCS had made "extraordinary" efforts in this case, and had provided the parents with a "multitude of appropriate and timely services." The proof supports this finding. Further, based on the severe abuse of the Children

by both Mother and Father, as discussed above, DCS was relieved of any obligation to work toward restoring custody of the Children to them. *See* Tenn. Code Ann. § 37-1-166 (2010) (DCS is not required to exercise "reasonable efforts" to reunify a child with his/her parent(s) where the parent(s) have subjected that child or a sibling of that child to "aggravating circumstances") and § 36-1-102(9) (defining "aggravating circumstances" to include "severe child abuse"). *See also **In re Keara J.***, 376 S.W.3d 86 (Tenn. Ct. App. 2012).

VIII.

A.

Father and Mother argue that DCS failed to show, by clear and convincing evidence, that termination is in the Children's best interest. When, as here, at least one ground for termination of parental rights has been established, DCS must then prove, by clear and convincing evidence, that termination of the parent's rights is in the children's best interest. ***White v. Moody***, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit by establishment of a ground for termination, the interests of parent and children diverge, and the focus shifts to what is in the children's best interest. ***In re Audrey S.***, 182 S.W.3d 838 at 877.

Tenn. Code Ann. § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. ***Id.*** at 878. Further, the best interest of a child must be determined from the child's perspective and not that of the parents. ***White***, 171 S.W.3d 187 at 194.

Tenn. Code Ann. § 36-1-113(i) lists the following factors for consideration:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

B.

In this case, the trial court considered the above factors and made the following findings, which we will paraphrase for brevity:

Neither parent made any significant adjustment in his/her circumstances because neither parent understood the nature of the Children's special needs, neither parent had exhibited the capacity to appropriately parent the Children, neither parent had

an appropriate home with enough space and security, and neither parent had addressed his/her own issues.

Given the time the Children had been in custody, neither parent had effected a significant adjustment, despite a "multitude of appropriate and timely services" by DCS, and such an adjustment did not appear to be reasonably possible.

While there had been visitation, the Children's relationship with the parents was not meaningful, and the Children did not want to visit the parents nor live with the parents. The parent/child relationship is not a positive one.

Allowing either parent to have the Children come home would set the Children back significantly, possibly irreversibly. The Children are making some progress with their current therapy/placements, but that progress is limited by the continuing contact with the parents.

The Children have suffered physical abuse and neglect at the hands of the parents.

Neither parent has learned and can demonstrate appropriate parenting for the Children, nor have they addressed their own mental health issues. The parents cannot provide safe and suitable supervision for the Children.

Nakila and Tavius have foster parents who are willing to adopt. Devonta will be much harder to find an adoptive home, but his current foster family is willing to keep him as a foster child. It is still in his best interest to terminate the parent/child relationship, however, so that he can realize he will never have to go home with them and he can heal.

The Children are traumatized by the visits with parents, and cannot begin healing until that traumatization stops.

DCS has made extraordinary efforts to achieve permanency for the Children. DCS cannot force Mother and Father to understand, learn, and change their behaviors.

The proof supports these findings, as has already been fully explained above. Thus, the trial court did not err in finding, by clear and convincing evidence, that termination is in the best interest of the Children.

IX.

The judgment of the trial court terminating the parental rights of Father and Mother is affirmed. The Court also affirms the trial court's finding of substantial noncompliance with the Children's permanency plans. The trial court's finding that Father and Mother were not guilty of severe child abuse is reversed as is the court's finding of persistence of conditions. Costs on appeal are taxed to appellants, Russell C. and Brandy C. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE